2007 ME 120

**TOWN OF WARREN AMBULANCE SERVICE**

**v.**

**DEPARTMENT OF PUBLIC SAFETY, MAINE EMERGENCY MEDICAL SERVICES.**

Supreme Judicial Court of Maine.

Argued: June 18, 2007.
Decided: Aug. 28, 2007.

Roger J. Katz, Benjamin J. Smith (orally), Lipman, Katz & McKee, P.A., Augusta, for plaintiff.

G. Steven Rowe, Attorney General, Laura Yustak Smith, Asst. Atty. Gen. (orally), Augusta, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, CALKINS, LEVY, SILVER, and MEAD, JJ.

LEVY, J.

[¶ 1] The Department of Public Safety, Maine Emergency Medical Services appeals from a judgment of the Superior Court (Kennebec County, *Marden, J.*) which affirmed in part, and vacated and remanded in part, a decision of the Emergency Medical Services Board. The Board interpreted its administrative rule, 9 C.M.R. 16 163 003–2 § 2(4)(A) (2003), as requiring the Town of Warren Ambulance Service (WAS) to respond to emergency calls from the State Prison, and it also denied WAS a waiver from this requirement. WAS cross-appeals from the court's affirmance of the Board's interpretation of its rule. We affirm the court's judgment regarding the Board's interpretation of the meaning of "public" as used in the rule, but vacate that part of the judgment that concluded that the Board erred in denying WAS's request for a waiver.

## I. BACKGROUND

[¶ 2] In 2002, the State Prison was moved to Warren. The State Prison is Maine's largest correctional facility, housing over 900 inmates.[1] WAS, a town-sponsored, volunteer ambulance service, provides emergency medical services (EMS) to the prison.

[¶ 3] In December 2004, WAS requested an opinion from the Department's staff that the State Prison is not part of the "public" for purposes of ambulance service response requirements and that WAS therefore has no duty to respond to calls from the prison. The staff interpreted the relevant rule, 9 C.M.R. 16 163 003–2 § 2(4)(A),[2] as requiring WAS to respond to

---

1. The record also indicates that the State Prison has approximately 400 staff members.

2. The rule provides that a ground ambulance service license or a non-transporting service license must be issued for a specific service area and defines a "service area" as including:

 A. Primary Response Area: Any area to which the service is routinely made available when called by the public to respond to medical emergencies.
 In defining a primary response area, a service will be expected to meet reasonable standards in regards to distance and response times from its base of operation to emergency scenes. Maine EMS, in concert with the regional medical director, will determine if such standards are met using the following criteria:
 1. Dispatch time/availability of ambulance and crew;
 2. Response times;
 3. Organized/coordinated dispatch;
 4. Public perception;
 5. Emergency responses across jurisdictions/public safety implications;
 6. Impact on patient care;
 And
 B. Secondary Response Area: Any area to which the service is routinely made available when called by other Maine EMS licensed services or health care facilities, as a specialty or mutual aid responder for emergency medical calls. The service receiving the request to respond to an emergency medical call outside of its primary response area shall coordinate with that area's primary EMS service to insure the most appropriate response based upon patient status;
 But does not include:
 C. Any other area to which the service may be made available for non-emergency medical calls.
 9 C.M.R. 16 163 003–2 § 2(4) (2003).

emergency calls from the prison, concluding that the inmates, staff, and visitors at the prison are members of the "public" within WAS's designated "primary response area." WAS appealed the staff's interpretation of the rule to the Board and, in the alternative, requested that the Board grant it a waiver from the requirements of the rule.

[¶ 4] At the hearing, the chairman of the Town's Board of Selectmen testified that WAS had provided the following number of transports before and after the State Prison opened in Warren in 2002:

| | 1999 | 2000 [3] | 2001 | 2002 | 2003 | 2004 | 2005 (as of May 3, 2005) |
|---|---|---|---|---|---|---|---|
| Total Transports by WAS | 97 | 116 | 153 | 191 | 217 | No Evidence | 89 |
| Transports by WAS from Correctional Facilities [4] in Warren | 3 | 6 | 5 | 39 | 49 | No Evidence | 17 |

[¶ 5] Effective July 1, 2004, the reimbursement rate for ambulance services at correctional facilities was statutorily changed to that of the prevailing Maine-Care rate. *See* 34–A M.R.S. § 3031–B (2006); *see also* 30–A M.R.S. § 1561(4) (2006) (corresponding change at county jails). As a result of this statutory change, WAS experienced a substantial reduction in the payments it receives for transporting prisoners.[5] The chairman also testified that in 2004 WAS had total expenses of $78,000 and generated revenues of $47,311.

[¶ 6] The Department presented evidence that the only facilities not currently considered to be part of the "public" for purposes of emergency transport are the hospitals in the state and two approved health care facilities, the Jackman Health Center and the Islands Community Health Center in Vinalhaven. All other calls of an emergency nature that originate in the state are considered emergency transports, and therefore the Department considers them to be coming from the public. The State Prison is not an approved health care facility for the purposes of the Maine EMS system.

[¶ 7] Following the hearing, the Board unanimously determined that the inmates, staff, and visitors at the State Prison are members of the "public" within the meaning of the relevant rule and that WAS is required to respond to emergency calls from the prison. The Board also denied WAS's request for a waiver from this requirement.

[¶ 8] In denying the waiver, the Board made findings of fact as to the five specific factors required by the Maine EMS waiver rule, 9 C.M.R. 16 163 013–2 § 2 (2003). The rule provides that "[a] waiver is to be granted only under extraordinary circumstances. This means that the Board must find a number of the [five] factors weighing in favor of a waiver before it is granted." *Id.* § 3. The five factors and the

---

**3.** In his testimony before the Board, the chairman of the Town's Board of Selectman, also a member of WAS, identified these numbers as being from 2002, but the context of his testimony suggests that he meant 2000.

**4.** Prior to 2002, a maximum security facility housing up to 100 inmates and a prison farm were located in Warren.

**5.** The record reflects that prior to the change WAS received $330 per call, and after the change WAS receives $90 per call plus $2 per mile one-way.

corresponding findings made by the Board follow:

1. Whether the person seeking the waiver took reasonable steps to ascertain the rule and comply with it.

"... [WAS] is aware of applicable rules and took reasonable steps to comply.... The Board finds this factor to be neutral in the waiver decision."

2. Whether the person seeking the waiver was given inaccurate information by an agent or employee of the State EMS program.

"... [WAS] was not given inaccurate information by any agent or employee of the State EMS program. The Board finds this factor to weigh against granting the waiver."

3. Whether the person seeking the waiver, or any other individual or group, would be significantly injured or harmed if the rule were not waived.

"... The [WAS] could be harmed (financially) if the rule is not waived. This finding supports a decision to grant a waiver."

4. Whether waiver of the rule in the particular case would pose a health or safety risk to the public at large or a particular individual or community.

"... [W]aiver of the rule in this particular case would pose a health or safety risk to the prison population, including staff and visitors. Waiver of the rule could result in delayed response times by necessitating response by a service farther from the Prison than [WAS]. The Board finds that this factor weighs against granting the waiver."

5. Whether waiver of the rule in the particular case would establish a precedent that would unduly hinder the Board or office of EMS in its administration of Maine's EMS system.

"... [W]aiver of the rule in this case would establish a precedent that would unduly hinder the Board or office of EMS in administering the Maine EMS system. This finding militates strongly against granting the waiver. If such a waiver were to be granted, EMS services could 'select' areas or populations within their primary response areas to which they did not wish to respond. There is potential that such selections might be based on not only the nature or frequency of calls to a particular area, but also the status of the persons making the calls. A high-demand area or group of residents who frequently required EMS assistance might be classified as unduly burdensome for financial or other reasons.... Ironically, such persons may be most in need of EMS services."

*Id.* § 2.

[¶ 9] The Board summarized its weighing of the factors as follows:

The Board notes that it is authorized to grant waivers only in extraordinary circumstances. The Board must find a number of the factors outlined in Chapter 13 § 2(1)-(5) weighing in favor of a waiver before granting the waiver.... The findings above do not rise to this standard. Granting the requested waiver carries a potential for prejudice and the risk that some members of the public may not have access to appropriate care. Granting this waiver would result in requests for other, similar waivers. It would place the EMS Board and office in the position of authorizing the selections made by services. This Board and the EMS system should not authorize its licensed services to "select" patients beyond the provisions for primary and secondary response areas

found in the Rules. Accordingly, the Board declines to grant the requested waiver.

[¶ 10] WAS petitioned the Superior Court for review of the final agency action pursuant to the Maine Administrative Procedure Act, 5 M.R.S. §§ 11001–11008 (2006) and M.R. Civ. P. 80C. The Superior Court affirmed the Board's decision with respect to its interpretation of the meaning of "public" as used in the Maine EMS Rules. However, the court found that "[t]he record is unequivocal that the petitioner is significantly injured or harmed if the rule is not waived and there is no evidence to support the contrary conclusion"; that the prison's effect of increasing the size of the "public" in Warren served by WAS by approximately twenty-five percent "unquestionably poses a health or safety risk to the non-prison population of the Town"; and that "it is unquestionable that such a unique set of circumstances clearly distinguishes this case from establishing any precedent which would act to the detriment of the Board or the office of EMS in its administration of Maine's EMS system." The court concluded that the evidence is "overwhelmingly contrary to the Board's decision on the question of waiver" and that the Board therefore abused its discretion in denying the waiver. The Department appeals from this determination, and WAS cross-appeals from the court's affirmance of the Board's interpretation of the meaning of "public" as employed in the rules.

## II. DISCUSSION

[¶ 11] When the Superior Court acts in an intermediate appellate capacity pursuant to M.R. Civ. P. 80C, this Court reviews the agency's administrative decision directly. *Tremblay v. Land Use Regulation Comm'n*, 2005 ME 110, ¶ 13, 883 A.2d 901, 904. "We review the agency's decision for legal errors, an unsustainable exercise of discretion, or unsupported findings of fact." *Id.* The agency's interpretation of its own internal rules, regulations, and procedures is given considerable deference and will not be set aside "unless the rule or regulation plainly compels a contrary result." *Downeast Energy Corp. v. Fund Ins. Review Bd.*, 2000 ME 151, ¶ 13, 756 A.2d 948, 951.

A. Whether the State Prison is Part of the "Public" Within WAS's Primary Response Area

[¶ 12] WAS is required to respond to calls for emergency medical assistance within the primary response area for which it is licensed. 9 C.M.R. 16 163 003–2 § 2(4)(A). "Any ground ambulance service offering response to emergency medical calls in the service's primary response area must be available twenty-four hours a day ... and shall not deny treatment or transport resulting from an emergency call if treatment or transport is indicated." 9 C.M.R. 16 163 003–4 § 8(1) (2003).

[¶ 13] The "primary response area" is "[a]ny area to which the service is routinely made available when called by the *public* to respond to medical emergencies." 9 C.M.R. 16 163 003–2 § 2(4)(A) (emphasis added). There is no dispute that the State Prison is within WAS's primary response area, but WAS does dispute the Board's determination that inmates and, implicitly, staff and visitors at the prison are members of the "public" as used in the definition of "primary response area."

[¶ 14] "Public" is not defined in the EMS rules. In looking to extrinsic sources to assist in interpreting the word "public," we conclude that the word, as used in the rule, is ambiguous. The dictionary consulted by the Board, and which was made part of the administrative record, defines "public" as "[t]he community or the people as a whole." THE AMERICAN HERITAGE DICTIONARY 1056–57 (New College ed. 1979).

This inclusive definition of "public" might cause one to conclude that all persons at the prison are members of the "public." We note, however, that courts have, for purposes of other statutes, found that inmates are not considered members of the "public" and that correctional facilities are not "public facilities." [6] Accordingly, reasonable people can disagree about whether incarcerated inmates, who have little or no actual involvement in a community because of their confinement in a correctional institution, should be considered members of the "public" that comprise the community.

■ [¶ 15] Because the word "public" in the Board's rule is ambiguous, we will defer to the Board's interpretation of its own rule unless the rule plainly compels an interpretation that would exclude inmates at the State Prison from WAS's primary response area. *See Downeast Energy Corp.*, 2000 ME 151, ¶ 13, 756 A.2d at 951. The Board's construction of "public" to include inmates at the prison is consistent with the statute's purpose of creating a statewide EMS system. *See* 32 M.R.S. § 81–A (2006) (noting statute's purpose "to promote and provide for a comprehensive and effective emergency medical services system to ensure optimum patient care" and Legislature's intent "to promote the public health, safety and welfare by providing for the creation of a statewide emergency medical services system with standards for all providers of emergency medical services"). A construction of the rule that would exclude prisoners and other high-risk populations from "public" would frustrate the statute's purpose of creating a statewide, comprehensive EMS system because it would potentially exclude prisoners, staff, and visitors at every state and county correctional facility in Maine from the definition of "public." The Board's rules do not compel a contrary result.

[¶ 16] The Board's interpretation of "public" is reasonable, and the Board did not commit an error of law when it concluded that calls from the State Prison, whether concerning an inmate, visitor, or staff member, are calls from the public within WAS's primary response area.

B. Whether the Board Erred by Denying the Request for a Waiver of the EMS Rule

■ [¶ 17] The next issue is whether the Board erred in refusing to waive the requirement that WAS respond to emergency calls from the prison. We will vacate or modify an agency's decision if the administrative findings, inferences, conclusions, or decisions are not supported by substantial evidence on the whole record or are arbitrary or capricious, or characterized by abuse of discretion. 5 M.R.S. § 11007(4)(c)(5), (6) (2006); *Cobb v. Bd. of Counseling Prof'ls Licensure*, 2006 ME 48, ¶ 10, 896 A.2d 271, 275.

[¶ 18] As previously noted, the Board has authority to waive any of its rules "if it determines that such a waiver would avert a significant injustice while preserving the public safety and the integrity of the statutory and regulatory components of the State's EMS system." 9 C.M.R. 16 163

---

**6.** *See, e.g., Brown v. Genesee County Bd. of Comm'rs*, 464 Mich. 430, 628 N.W.2d 471, 474, 476 (2001) (holding that an inmate is not a member of the "public" for purposes of a particular state statute and therefore does not have standing to sue the jail in a slip and fall case, but also holding that a jail is nonetheless open for use by members of the public, such as visitors or those applying for a job or making deliveries to the jail); *accord Bobbitt v. Detroit Edison Co.*, 216 F.Supp.2d 669, 674–75 (E.D.Mich.2002); *see also Blizzard v. Floyd*, 149 Pa.Cmwlth. 503, 613 A.2d 619, 621 (1992) (holding that it is "clear that a state correctional institution is not a public accommodation as defined by the [Pennsylvania Human Relations Act]").

013–2 § 1. The Superior Court acknowledged that the Board "carefully weighed the factors relating to whether it should have granted a waiver to the Town." Neither party takes issue with the Board's findings as to the first and second factors, focusing instead on the Board's findings with regard to the third, fourth, and fifth factors set forth in the rule.

### 1. Significant Injury or Harm if the Waiver is not Granted

[¶ 19] With respect to the third factor—whether the person seeking the waiver, or any individual or group, would be significantly injured or harmed if the rule were not waived—the Board determined that WAS could be harmed financially without a waiver. The court determined, however, that the Board should have also concluded that the general health and safety of the Town's non-prison population would be harmed if the waiver was not granted. The court found that "increasing the public population by almost 25% [as a result of the opening of the State Prison] unquestionably poses a health or safety risk to the non-prison population of the Town." The court also noted WAS's contentions that its female volunteers are "wary" of responding to the prison, and that WAS experienced a budget shortfall in 2004 resulting from the increase in the call volume from the prison and the reduced Maine-Care reimbursement rate for the services it provides. Contrary to the Superior Court, we conclude that the Board was not compelled by the evidence it received to reach the same findings as did the court.

[¶ 20] First and foremost, the administrative record does not establish that WAS has been prevented in any manner from providing reasonable emergency medical transport services in the Town since the opening of the State Prison. The Board received evidence that WAS relies on its mutual aid agreements with surrounding towns for coverage if WAS is occupied with a call to the prison and a separate non-prison ambulance call is received. WAS presented no evidence as to how its reliance on mutual aid agreements, in such a circumstance, results in harm to the rest of the Town.

[¶ 21] Second, the administrative record does not compel a finding that WAS has or will lose female volunteers if it remains obligated to provide services to the prison. The only evidence that WAS cites as compelling such a finding is that some of its volunteers were "concerned" or "very uncomfortable" about going to the prison. There was no evidence of any volunteer, female or male, resigning or threatening to resign. There was evidence of an instance in which a prisoner that WAS transported was found to have a razor blade hidden in his mouth. The Board also considered, however, that prison calls are not inherently more dangerous than non-prison calls, largely because of the high degree of security present at the prison. Each inmate is treated at the prison infirmary and is searched and restrained by prison staff prior to transport, and a guard accompanies the inmate in the back of the ambulance. This is in contrast to the absence of any prior medical screening or security measures when an ambulance responds to a call at a private residence.[7]

[¶ 22] Third, WAS established that it had operated at a deficit in 2004, but did not present evidence to establish whether the 2004 deficit was attributable to the services it provided to the prison or to compare 2004 with its budget in other years. WAS also did not submit evidence

---

7. One female Board member who is an emergency medical technician paramedic observed: "I find ... going into someone's home much more dangerous than taking somebody out of prison."

regarding its total number of calls in 2004 and the number that were prison-related. Nor did it provide information as to the nature of its expenditures in 2004 and the extent to which those expenditures, such as payments made for the services of paramedics, resulted from the prison-related calls. On this record, the Board was not compelled to conclude that WAS's apparent operating deficit primarily resulted from the services provided to the prison or that the deficit was so serious as to jeopardize WAS's very existence.

2. Health or Safety Risk to the Public at Large or a Particular Individual or Community if the Waiver is Granted

[¶ 23] With respect to the fourth factor—whether waiver of the rule would pose a health or safety risk to the public at large or a particular individual or community—the Superior Court did not question the Board's finding that the health and safety of those at the prison might be harmed if the waiver is granted. Before us, WAS contends that this finding is unsupported by record evidence.

[¶ 24] WAS asserts that the Board failed to fully consider unrebutted evidence regarding the prison's twenty-four-hour-a-day, professionally-staffed infirmary. In its oral deliberations, the Board noted that, contrary to WAS's position, the infirmary cannot substitute for the emergency transportation needs of all ill or injured persons at the prison. *See* 32 M.R.S. § 83(5) (2006) (" 'Ambulance service' means any person, persons or organization which holds itself out to be a *provider of transportation* of ill or injured persons or which routinely *provides transportation* for ill or injured persons.") (emphasis added). It was reasonable for the Board to conclude that some of the patients at the prison will need a higher level of care than can be provided by the infirmary and that the infirmary cannot substitute for emer-

gency transportation services provided by WAS. In addition, the evidence shows that the private ambulance service that might have replaced WAS if the waiver was granted is farther from the prison and does not have a primary response license for the area.

[¶ 25] The Board is composed of numerous health care and emergency transport professionals familiar with the practicalities of an emergency transport system. *See* 32 M.R.S. § 88(1)(A) (2006). Based on the record, we cannot say that the Board's finding that there would be harm to the prison population if the waiver was granted was unsupported by substantial evidence.

3. Whether a Waiver Would Establish Precedent that Would Unduly Hinder the Administration of Maine's EMS System

[¶ 26] With respect to the fifth factor, the court concluded that "in light of the evidence of the prison population present in a community the size of Warren, it is unquestionable that such a unique set of circumstances clearly distinguishes this case from establishing any precedent which would act to the detriment of the Board or the office of EMS in its administration of Maine's EMS system."

[¶ 27] Contrary to this reasoning, the Board considered that if the waiver was granted, other ambulance services might seek waivers as to other facilities and institutions that have a high concentration of MaineCare beneficiaries or other people for whom ambulance services will be reimbursed at MaineCare rates, such as nursing homes and Maine's eight other state correctional facilities, and the fifteen county jails. Although WAS asserted that the State Prison is unique because of the size of its population, the Board was not compelled to find that the MaineCare-related

rationale for the waiver would not also apply to smaller institutions with a high rate of service calls. Maine's two juvenile correctional facilities were cited as two such examples of smaller institutions that have a disproportionate number of calls for emergency transport services.

### 4. Conclusion

[¶ 28] The basis for WAS's waiver request arises from a combination of the opening of the State Prison in Warren in 2002 and the Legislature's enactment of MaineCare reimbursement rates for emergency transport services provided to the prison in 2004. The administrative record suggests that since 2004, representatives of the Town and the prison have had no more than preliminary discussions to consider alternative solutions. It is also plain that this issue has a political dimension that could be addressed to the Legislature. *See Wright v. Dep't of Defense & Veterans Servs.*, 623 A.2d 1283, 1284–85 (Me.1993); *Ace Ambulance Serv., Inc. v. City of Augusta*, 337 A.2d 661, 663 (Me.1975). We encourage the parties to explore non-judicial solutions. Our judicial review, however, is necessarily limited to the decision made by the Board in this case. Based on the record in this judicial proceeding, we cannot conclude that the Board erred when it determined that WAS failed to establish "extraordinary circumstances" in support of a waiver.

The entry is:

Judgment vacated, and remanded to the Superior Court for further proceedings consistent with this opinion.