2008 ME 91

**Robert NELSON et al.**

**v.**

**BAYROOT, LLC, et al.**

Supreme Judicial Court of Maine.

Argued: March 12, 2008.

Decided: May 29, 2008.

William V. Ferdinand, Esq. (orally), Eaton Peabody, Augusta, ME, for Bayroot, LLC.

Peggy L. McGehee, Esq. (orally), Perkins Thompson, Portland, ME, for Robert & Patricia Nelson.

G. Steven Rowe, Attorney General, Amy Mills, Asst. Atty. Gen. (orally), Augusta, ME, for Maine Land Use Regulation Commission.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, MEAD, and GORMAN, JJ.

Concurrence: SILVER, J.

LEVY, J.

[¶ 1]  Bayroot, LLC, appeals and Robert and Patricia Nelson cross-appeal from a judgment of the Superior Court (Kennebec County, *Marden, J.*) vacating the Land Use Regulation Commission's approval of Bayroot's application to amend a subdivision plan on Bayroot's property around Parmachenee Lake in the Lynchtown and Parmachenee Townships.  Bayroot contends that (1) the Nelsons lacked standing to appeal from the Commission's decision; (2) the Commission's rule requiring substantial completion of certain development and construction by October 1, 2004, did not apply to Bayroot's existing 1972 subdivision, *see* 4 C.M.R. 04 061 010–23 to –24 § 10.17 (2006); (3) a written decision of the full Commission regarding soil suitability for proposed relocation of four subdivision sites was not required; and (4) even if the relocation of those four sites was not properly approved, the permit remained valid as to the remaining sites.  In their cross-appeal, the Nelsons argue that the Superior Court should have concluded that five undeveloped sites other than those that had been relocated to suitable soil were abandoned nonconforming sites.

[¶ 2]  Although we conclude that the Nelsons had standing to appeal, we vacate the Superior Court's judgment and remand for the entry of a judgment affirming the Commission's approval of Bayroot's application because we conclude that the subdivision met the requirements of the Commission's rule requiring substantial completion by October 1, 2004, that the Commission properly approved the relocation of all sites pursuant to Bayroot's application, and that the subdivision never lapsed as an abandoned nonconforming use.

I.  FACTUAL BACKGROUND

[¶ 3]  In 1972, the Commission approved a nineteen-lot subdivision as a "campsite leasing program" within 31,000 acres surrounding Parmachenee Lake. The Commission's approval was subject to several conditions, including the requirement that the applicant obtain Commission approval of new locations for four of the nineteen campsites—numbers 3, 9, 13, and 14—so that they would have suitable soils.

[¶ 4]  More recently, the Commission adopted a rule in its Land Use Districts and Standards providing for the expiration of authorized uses that were neither "substantially started" nor "substantially completed" by October 1, 2004.  4 C.M.R. 04 061 010–23 to –24 § 10.17 (2006).  In response, Bayroot, the current owner of the subdivision land, obtained an advisory ruling from the Division Manager of the Commission's Permitting and Compliance Division regarding its rights and duties as to the nine lots that were undeveloped and that Bayroot proposed to relocate.  The advisory ruling, issued on September 9, 2004, approved the relocation of the four sites with inadequate soil to Bayroot sites 3, 5, 8, and 9, noting that Bayroot had obtained soil evaluations by a soil scientist. The Commission also advised that an amendment to the subdivision would be necessary to relocate the five remaining lots.

[¶ 5]  Bayroot, treating the advisory ruling as Commission approval, relocated and leased the four lots that it had been required to relocate and applied for an amendment to the subdivision to authorize relocating the five other undeveloped sites in the subdivision to cluster them near the sites approved in the administrative ruling. The effect of the proposed relocation would be to increase by four the total number of lots on the shorefront of Parmachenee Lake. On September 7, 2006, the Commission approved Bayroot's applica-

tion to amend the subdivision to relocate the five previously approved lots.

[¶ 6]   The Nelsons are leaseholders of a developed lot in the subdivision.   They participated in the administrative proceedings by communicating their concerns about the proposed subdivision amendment to the Commission by electronic mail.   After the Commission approved the subdivision amendment, the Nelsons appealed from this decision to the Superior Court pursuant to 12 M.R.S. § 689 (2007), 5 M.R.S. § 11001(1) (2007), and M.R. Civ. P. 80C.   The court vacated the Commission's decision for two reasons: (1) Bayroot never obtained approval to relocate the four sites identified in the initial subdivision because they obtained only an advisory ruling, not Commission approval; and (2) the permits for all nine undeveloped lots expired pursuant to section 10.17 of the Commission's Land Use Standards.   This appeal and cross-appeal followed.

## II.   LEGAL ANALYSIS

### A.   Standing

[¶ 7]   Bayroot argues that the Nelsons lack standing to appeal from the Commission's decision because they did not suffer a particularized injury.   In support, Bayroot notes that the Nelsons held only a leasehold interest in one site in the subdivision; the relocated lot nearest to the Nelsons in the subdivision is 3500 feet across the lake and a peninsula; and the Nelsons failed to provide evidence to support their contention that the wilderness character of the lake would be impaired or that they would suffer any other direct adverse effect.[1]

[¶ 8]   The Nelsons argue that they have standing because, as leaseholders in the subdivision, they have an interest in the undeveloped land where the relocated lots will be sited.   They contend that their leasehold is not separated by geographic boundaries from the other parts of the 31,000–acre subdivision property and that they are within the affected subdivision, which makes their interest even more direct than would be the interest of an abutter to the subdivision.   The Nelsons liken their interest to the interest a lot owner has in spaces designated as reserved or open in some subdivisions.   They further contend that the serenity of the lake for fly-fishing and wilderness experience will be diminished and that this will result in a decrease in the value of their leasehold.

[¶ 9]   The right to appeal from an administrative decision is governed by statute.   *Consumers for Affordable Health Care, Inc. v. Superintendent of Ins.*, 2002 ME 158, ¶ 15, 809 A.2d 1233, 1238.   Whether a party has standing depends on the wording of the specific statute involved.   *Id.*   The statute authorizing appeals from decisions of the Commission provides that appeals must be brought pursuant to the provisions of the Administrative Procedure Act: "Persons aggrieved by final actions of the commission, including without limitation any final decision of the commission with respect to any application for approval or the adoption by the commission of any district boundary or amendment thereto, may appeal therefrom in accordance with Title 5, chapter 375, subchapter VII [5 M.R.S. §§ 11001–11008 (2007)]."   12 M.R.S. § 689.   The Administrative Procedure Act provides a right to

---

1.   Bayroot also argues that the Nelsons lack standing to contest a discretionary decision whether to enforce zoning.   An appeal from the grant of a subdivision amendment is not, however, an appeal from a failure to enforce zoning.   *Cf. Herrle v. Town of Waterboro*, 2001 ME 1, ¶ 10, 763 A.2d 1159, 1161–62 (describing the discretion of a municipal official to decide whether to bring an enforcement action).

judicial review for those aggrieved by final agency action. 5 M.R.S. § 11001(1).[2]

[¶ 10] A person is aggrieved within the meaning of the APA if that person has suffered particularized injury—that is, if the agency action operated prejudicially and directly upon the party's property, pecuniary or personal rights. *Storer v. Dep't of Envtl. Prot.*, 656 A.2d 1191, 1192 (Me.1995); *Hammond Lumber Co. v. Fin. Auth. of Me.*, 521 A.2d 283, 286 (Me. 1987). The injury suffered must be distinct from any experienced by the public at large and must be more than an abstract injury. *Delogu v. City of Portland*, 2004 ME 18, ¶ 1 n. 1, 843 A.2d 33, 34. We examine the issue of standing in context to determine whether the asserted effect on the party's rights genuinely flows from the challenged agency action. *See Roop v. City of Belfast*, 2007 ME 32, ¶¶ 9–10, 915 A.2d 966, 969.

[¶ 11] Although the Nelsons are not abutters under the meaning described in our jurisprudence, *see id.* ¶ 8, 915 A.2d at 968–69, they contend that they have demonstrated a direct interest in the undeveloped land as leaseholders in the 31,000–acre subdivision.[3] In essence, the Nelsons argue that the undeveloped areas of the subdivision should be treated as a common area over which the Nelsons have rights. Courts of other jurisdictions have held that those with interests in property contained in a subdivision have interests in other subdivision property. *See, e.g., Cudjoe Gardens Prop. Owners Ass'n v. Payne*, 770 So.2d 190, 190 (Fla.Dist.Ct.App.2000) (holding that, because the owners' association owned a platted lot within the subdivision, it had standing to sue to enforce

---

2. Section 11001(1) of the Administrative Procedure Act provides as follows:

> Except where a statute provides for direct review or review of a pro forma judicial decree by the Supreme Judicial Court or where judicial review is specifically precluded or the issues therein limited by statute, *any person who is aggrieved by final agency action shall be entitled to judicial review thereof in the Superior Court* in the manner provided by this subchapter. Preliminary, procedural, intermediate or other nonfinal agency action shall be independently reviewable only if review of the final agency action would not provide an adequate remedy.

5 M.R.S. § 11001(1) (2007) (emphasis added).

3. The Nelsons rely on two cases to assert their interest in the land beyond their site. In *Arnold v. Boulay*, we cited with approval the following passage from a New Jersey decision:

> "Whenever the owner of a tract of land lays it out into blocks and lots upon a map, and on that map designates certain portions of the land to be used as streets, parks, squares, or in other modes of a *general* nature calculated to give additional value to the lots delineated thereon, and then conveys those lots by reference to the map, he *becomes bound to the grantees not to use the portions so devoted to the common advantage otherwise than in the manner indicated.* This principle has been asserted most frequently for the purpose of supporting dedications to uses strictly public; but it is by no means necessary that such a use should be created.... From this doctrine it, of course, follows that such distinct and independent private rights in other lands of the grantor than those granted may be acquired, by implied covenant, as appurtenant to the premises granted, although they are not of such a nature as to give rise to public rights by dedication. *The object of the principle is, not to create public rights, but to secure to persons purchasing lots under such circumstances those benefits, the promise of which, it is reasonable to infer, has induced them to buy portions of a tract laid out on the plan indicated."*

147 Me. 116, 121, 83 A.2d 574, 577 (1951) (emphasis added) (quoting *Lennig v. Ocean City Ass'n*, 41 N.J.Eq. 606, 7 A. 491, 493 (Err. & App.1886)). The Nelsons also cite to the case of *Chase v. Eastman*, in which we characterized land described as "reserved" on a Town plan as creating an easement for the use of that property for waterfront access by the purchasers of inland lots. 563 A.2d 1099, 1100–02 (Me.1989).

subdivision deed restrictions); *Nelson v. Roscommon County Rd. Comm'n,* 117 Mich.App. 125, 323 N.W.2d 621, 624 (1982) (stating that "a purchaser of property in a recorded plat receives not only the interest as described in the deed but also whatever rights are indicated in the plat," including the use of streets and ways).

[¶ 12] Because the Nelsons are lessees of one of the initially approved sites in the Bayroot subdivision, we look to the terms of their lease agreement with Bayroot to understand the nature of their interest in the undeveloped land of the subdivision. The lease agreement describes the property as being approximately one acre in size and as shown on the site plan, but the site plan does not show lot boundaries. Bayroot has the right pursuant to the lease to provide or modify the metes and bounds of the premises. The lease agreement contemplates that the Nelsons have the right to go across the other Bayroot lands and that the Nelsons may use Bayroot's private roads and boat slips. The stated purpose of the lease is for non-commercial, non-professional, recreational use. The lease permits the Nelsons to operate snowmobiles and all-terrain vehicles on other Bayroot lands, subject to restrictions detailed in the lease. The Nelsons also have the right of first refusal to purchase the leased lot if it is ever offered for sale and the right to a firewood permit, which allows them to collect up to two cords of wood from Bayroot's forest lands each year. The lease agreement also gives the Nelsons the right to use springs for water without any indication of where those springs may be located, and an attachment to the lease agreement makes it clear that the Nelsons were given keys to allow passage through a gate system that is set up around the lake so that they can pass on the roads where others cannot.

[¶ 13] Based on these lease provisions, we agree with the Nelsons' argument that their leasehold right to use the entire 31,-000–acre subdivision area is similar to the right of subdivision lot owners or leaseholders to use areas identified on subdivision plans as "reserved areas," "parks," "squares," "open space," or "common areas," in common with other subdivision lot owners or leaseholders. As we held in *Arnold v. Boulay,* the purpose of this principle is to "secure to persons purchasing lots under [certain] circumstances those benefits, the promise of which, it is reasonable to infer, has induced them to buy portions of a tract laid out on the plan indicated." 147 Me. 116, 121, 83 A.2d 574, 577 (1951) (quotation marks omitted).

[¶ 14] It is reasonable to infer that those entering into these lease agreements with Bayroot did so with the expectation that they would have particular rights to make use of the remaining lands of the Bayroot subdivision, subject to the restrictions specified in the lease agreement, which are rights distinguished from those of the general public. *See Delogu,* 2004 ME 18, ¶ 1 n. 1, 843 A.2d at 34. Thus, we conclude that the Nelsons have standing.

B. Section 10.17 of the Commission's Land Use Standards

[¶ 15] Bayroot argues that the deadline set by section 10.17 of the Commission's rules is inapplicable to the subdivision because a subdivision of land, without more, is not a "development or use" regulated by the rule. Bayroot also argues that, by the terms of section 10.17, getting a "substantial start" refers to construction activity, not mere platting, recording, or setting of monuments for purposes of subdivision. Bayroot contends that, if the rule does apply, a substantial start has been made in subdividing the land by recording the subdivision and executing leases for any of the

lots. The Commission acknowledges that, although it took a conservative approach in interpreting the rule to apply in the underlying proceeding, it now believes that the rule is inapplicable.

[¶ 16] The Nelsons argue that section 10.17 applies because a campsite lease program is a land use activity. By statute, the Nelsons argue, a subdivision is defined to include uses, such as "the division, placement or construction of a structure or structures on a tract or parcel of land resulting in 3 or more dwelling units within a 5–year period." 12 M.R.S. § 682(2–A) (2007).

[¶ 17] We review a state agency's decision directly for legal errors, abuse of discretion, or unsupported factual findings. *Town of Warren Ambulance Serv. v. Dep't of Pub. Safety*, 2007 ME 120, ¶ 11, 930 A.2d 1052, 1056. In reviewing an agency's interpretation of its own rules, regulations, or procedures, we give considerable deference to the agency and will not set aside the agency's interpretation unless the regulation or rule compels a contrary interpretation. *Id.*

[¶ 18] We are asked to interpret section 10.17 of the Commission's Land Use Standards, which governs the expiration of permits. It provides:

> If a development or use requiring a permit is not substantially started within the time period specified in the permit conditions of approval, or is not substantially completed within the time period specified, the permit lapses and further development or activity is prohibited thereafter unless and until a new permit is granted, or the Commission otherwise specifically authorizes.

4 C.M.R. 04 061 010–23 § 10.17 (2006). It also provides "that, with respect to permits issued prior to July 1, 2003, that do not specify any expiration date, that date shall be October 1, 2004." 4 C.M.R. 04 061 010–24 § 10.17 (2006).[4] Bayroot contends that, because this provision applies to "a development or use," it is inapplicable to subdivision approvals, which merely permit an owner to divide and convey lots.

[¶ 19] By statute, "A person may not commence development of or construction

---

4. In its entirety, section 10.17 provides:
   If a development or use requiring a permit is not substantially started within the time period specified in the permit conditions of approval, or is not substantially completed within the time period specified, the permit lapses and further development or activity is prohibited thereafter unless and until a new permit is granted, or the Commission otherwise specifically authorizes.

   Except as otherwise authorized by the Commission, uses authorized under a permit must be substantially started within 2 years of the effective date of the permit and substantially completed within 5 years of the effective date of the permit; provided that, with respect to permits issued prior to July 1, 2003, that do not specify any expiration date, that date shall be October 1, 2004.

   For the purpose of these rules, "substantial start" shall mean the first placement of permanent construction of a structure on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways; nor does it include excavation for basement, footing, piers, or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not part of the main structure.

   Also for the purpose of these rules, "substantial completion" shall mean completion of all permit conditions of approval.
   4 C.M.R. 04 061 010–23 to –24 § 10.17 (2006).

on any lot, parcel or dwelling unit within any subdivision or sell or offer for sale any interest in any lot, parcel or dwelling unit within any subdivision without a permit issued by the commission." 12 M.R.S. § 685–B(1)(B) (2007). In its rules, the Commission has defined the term "development" as "[a]ny land use activity or activities directed toward using, reusing or rehabilitating air space, land, water or other natural resources, excluding, however, such specific uses or classes and categories of uses which by the terms of this chapter do not require a permit." 4 C.M.R. 04 061 010–7 § 10.02(42) (2007). The definition of "development" contained in the Commission's rules conflicts with the narrow definition of the term that Bayroot and the Commission urge us to apply in the present appeal. The subdivision at issue here is directed toward using land and water resources, and a permit is required by statute and by the Commission's rules to amend a subdivision. 12 M.R.S. § 685–B(1)(B); 4 C.M.R. 04 061 004–4 to –5 § 4.03(5) (2000) (defining which parties may apply to amend a subdivision permit).

[¶ 20] Thus, Bayroot was required to demonstrate not just a "substantial start," but "substantial completion" by October 1, 2004, which is mandated for all forms of development requiring a permit. See 4 C.M.R. 04 061 010–23 to –24 § 10.17 (2006). The record demonstrates that the subdivision of the Bayroot lots was substantially complete by October 1, 2004. By that date, all lots had been mapped and leased; Bayroot had been advised that four of the lots were properly relocated to comply with the condition imposed by the 1972 permit; and Bayroot had applied to amend the subdivision to relocate the five other lots.

[¶ 21] The remaining question is whether Bayroot had achieved "completion of all permit conditions of approval," which

section 10.17 requires to demonstrate substantial completion of the permitted activity. 4 C.M.R. 04 061 010–24 § 10.17 (2006). The parties do not dispute that Bayroot complied with the standard conditions for the 1972 subdivision, which required compliance with all federal, state, and local licensing requirements and the sharing of information with the Commission, among other things. Nor do the parties dispute compliance with the conditions that a plumbing permit be obtained for site 1, which had an existing camp in 1972, or that only the B slopes of Stetson soil be used on sites 4, 18, and 19.

[¶ 22] The only condition in dispute required that lots 3, 9, 13, and 14 be relocated to sites with suitable soil. Although an advisory ruling is normally not binding on the Commission, see 5 M.R.S. § 9001(3) (2007); 4 C.M.R. 04 061 004–2 § 4.02 (2000), the Division Manager's ruling issued on September 9, 2004, regarding compliance with this condition was sufficient because the 1972 permit did not specify the formality required for approval of the relocation and because the Division Manager was performing only a technical review of soil suitability, not making an original permit decision. The Commission later endorsed the staff's technical approval when it approved Bayroot's subdivision amendment and stated that Bayroot was allowed to relocate the four sites with deficient soil to its proposed sites 3, 5, 8, and 9. The Commission ruled that the sites would be "considered sites approved by permit in 1972."

[¶ 23] In these circumstances, the Commission did not err in concluding that the 1972 permit conditions had been satisfied and that the permit was "substantially complete" as of October 1, 2004. See 4 C.M.R. 04 061 010–23 to –24 § 10.17 (2006).

## C. The Nelsons' Cross–Appeal

[¶ 24] In their cross-appeal, the Nelsons argue that all lots that were not in use by October 1, 2004, were abandoned nonconforming uses. Bayroot contends that the issue has never been whether a use was abandoned; rather, the question is whether the subdivision, which was never abandoned, could be amended.

[¶ 25] The Commission's rules require permits "for all expansions, reconstructions, relocations, changes of use, or other development of nonconforming structures, uses and lots, except where specifically provided in section 10.11." 4 C.M.R. 04 061 010–20 § 10.11(B)(1) (2006). Legally existing nonconforming uses and lots are allowed to continue, however. 4 C.M.R. 04 061 010–20 § 10.11(A) (2006); *see also* 12 M.R.S. § 685–A(5) (2007) (prohibiting a land use standard from depriving an owner or lessee of an interest to which it was lawfully devoted at the time of the standard's adoption). If a nonconforming use has been abandoned for more than two years, it may not be resumed. 4 C.M.R. 04 061 010–23 § 10.11(D)(3) (2006).

[¶ 26] In the present case, the subdivision itself was never abandoned, though certain lots were left undeveloped for more than two years. Further, the amendments proposed to that existing nonconforming use aimed to decrease nonconformity. Specifically, as the Commission found, the concentration of lots in close proximity to one another advances the Commission's current policy to discourage scattered development and sprawl. *See* Dep't of Conservation, Me. Land Use Regulation Comm'n, Comprehensive Land Use Plan, ch. 5, goal II(A), policy 2, at 140 (1997). Because the subdivision was never abandoned, and because the proposed amendment served to decrease the subdivision's nonconformity, the nonconforming use provisions identified by the Nelsons did not prohibit the Commission from approving the amendment of the Bayroot subdivision.

The entry is:

Judgment vacated. Remanded to the Superior Court to affirm the Commission's approval of both the relocation of the four lots to suitable soils and Bayroot's application to amend the subdivision.

SILVER, J., concurring.

[¶ 27] I concur in the result, but write separately because I would conclude that the Nelsons do not have standing to challenge the Commission's approval of Bayroot's application. Although the Nelsons hold a leasehold interest in the 31,000 acres of their wilderness subdivision, many portions of which are common areas, the relocated lots are far from the Nelsons' lot and will impose a remote, if not virtually nonexistent, injury on the Nelsons.

[¶ 28] The relocated lots are approximately 3500 feet across the lake and a peninsula from the Nelsons' lot and many miles away from the Nelsons' lot by road. From the Nelsons' lot, two peninsulas block the view of the relocated lots. The four additional lakefront lots in question are, furthermore, not new lots; they existed in different locations in the original nineteen-lot subdivision, and so the Nelsons should have been aware of their presence.

[¶ 29] In order to have standing, the Nelsons must suffer a particularized injury. In this case, the Nelsons, at worst, will have to share 31,000 acres of wilderness with four additional lakefront permit holders. The alleged harm is, therefore, remote and virtually nonexistent. There is certainly no agency action operating prejudicially and directly upon the Nelsons' property, pecuniary, or personal rights. *See Storer v. Dep't of Envtl. Prot.*, 656 A.2d 1191, 1192 (Me.1995); *Hammond*

*Lumber Co. v. Fin. Auth. of Me.*, 521 A.2d 283, 286 (Me.1987).

[¶ 30] The Court cites cases in which parties share a common area in a subdivision and notes that the aggrieved party has standing to challenge changes in the common areas of the subdivision. *Cudjoe Gardens Prop. Owners Ass'n v. Payne*, 770 So.2d 190, 190 (Fla.Dist.Ct.App.2000); *Nelson v. Roscommon County Road Comm'n*, 117 Mich.App. 125, 323 N.W.2d 621, 624 (1982). The impact on litigants in those cases was much more substantial than the minimal to nonexistent impact the Nelsons will experience.