MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2013 ME 102
Docket:       BCD-13-56
Argued:       September 11, 2013
Decided:      November 21, 2013

Panel:        SAUFLEY, C.J., and <u>ALEXANDER</u>, LEVY, SILVER, MEAD, GORMAN, and JABAR,
              JJ.


# GUARANTEE TRUST LIFE INSURANCE COMPANY

v.

# SUPERINTENDENT OF INSURANCE


ALEXANDER, J.

[¶1]   Guarantee Trust Life Insurance Company (GTL) appeals from a

judgment entered in the Business and Consumer Docket (*Horton, J.*) that affirmed

a decision of the Superintendent of Insurance.  The Superintendent concluded that

GTL violated 24-A M.R.S. §§ 1420-M(1),[1] 1902,[2] and 2412(1-A)(B)[3] (2012) and

---

[1]  Title 24-A M.R.S. § 1420-M(1) (2012) states, "An insurance producer may not act as an agent of an insurer unless the insurance producer becomes an appointed agent of that insurer.  An insurance producer who is not acting as an agent of an insurer is not required to become appointed."

[2]  Title 24-A M.R.S. § 1902 (2012) states, in part, "A person may not act as or profess to be an administrator after August 1, 1990, unless licensed under this chapter."

[3]  Title 24-A M.R.S. § 2412(1-A)(B) (2012) provides, in relevant part:

> An insurer may not provide coverage to a resident of this State under a group or blanket policy or contract issued and delivered outside this State unless . . . [f]or trustee group policies . . . and association group policies . . . , certificates of coverage to be delivered or issued for delivery in this State [are] filed with the superintendent at least 60 days before any solicitation in this State, with sufficient information concerning the nature of the group, including any trust agreements or association bylaws, to enable the superintendent to determine whether the group satisfies the statutory requirements for a trustee or association group.

2

that GTL is accountable, pursuant to 24-A M.R.S. § 1445(1)(D) (2012),[4] for violations committed by Cinergy Health, Inc., a company acting as GTL's producer. Based on these conclusions, the Superintendent ordered GTL to pay a civil penalty of $150,000.

[¶2] GTL argues that (1) it cannot be accountable pursuant to section 1445(1)(D) for Cinergy's misconduct occurring at a time when no common law agency relationship existed between the companies; (2) there is insufficient evidence to support the Superintendent's finding that GTL certificates of coverage were issued to Maine consumers and therefore GTL could not be found liable pursuant to section 2412(1-A)(B); (3) the Superintendent's decision should be vacated as untimely; (4) the Superintendent abused her discretion by holding GTL liable under section 1420-M because that section applies to producers and because Cinergy was not GTL's agent; and (5) the Superintendent abused her discretion by penalizing GTL for violating 24-A M.R.S. § 1902, when a violation of that statute had not been alleged in the Bureau of Insurance's amended petition. We affirm the judgment.

---

[4] Title 24-A M.R.S. § 1445(1)(D) (2012) states, in part, "In addition to any other applicable provisions of law, the insurer . . . [i]s accountable and may be penalized by the superintendent, as provided for in this Title, for the actions of its producers."

## I. CASE HISTORY

[¶3]   GTL is an Illinois-domiciled insurance company licensed to do business in Maine as an insurance company.  Cinergy Health, Inc., based in Florida, was licensed in Maine as a nonresident producer agency.  Cinergy began marketing a limited medical benefit health insurance plan to individuals nationwide in 2007.  Pursuant to an agreement between Cinergy and the National Congress of Employers (NCE), Cinergy marketed coverage under the plan to individuals who, by virtue of enrolling in the plan, became members of NCE. NCE was a New York non-profit association, but was not an approved association in Maine.

[¶4]  In most states, the limited medical benefit plan that Cinergy marketed and sold was provided under a policy or policies issued to NCE by American Medical and Life Insurance Company (AMLI), a New York insurance company. AMLI had applied for a license to provide insurance coverage in Maine.  However, the Bureau of Insurance deemed AMLI not qualified and denied its application to provide insurance to Maine consumers in 2006.

[¶5]   To enable it to offer the limited medical benefit plan marketed by Cinergy in Maine, AMLI entered into an agreement with GTL (the Agreement), effective January 1, 2008, in which GTL would act as a "fronting carrier" for AMLI because GTL is fully licensed to issue insurance in Maine.  Under this

arrangement, GTL would "issue a policy, and [AMLI] and its entities [would] perform the administration of that policy, and through a reinsurance agreement, a majority of the risk [would] be shifted to [AMLI]."[5] Pursuant to the Agreement, GTL retained ten percent of the risk (profits or losses) and received five percent of the gross net collected premiums. As part of the fronting arrangement, GTL and AMLI contracted in the Agreement that any insurance premiums paid to AMLI were deemed to have been received by GTL.

[¶6] GTL issued a group limited benefits health insurance policy to NCE, effective January 1, 2008 (the Master Policy). GTL's issuance of the Master Policy enabled GTL to provide coverage under NCE-issued policies to individuals in Maine. Evidence in the record also indicates that GTL confirmed that it "issued at least one insurance policy to a Maine resident through [NCE]." GTL never obtained approval from the Bureau of Insurance to issue a group policy to NCE in Maine.[6]

---

[5] Pursuant to the Agreement, GTL agreed to "provide AMLI, and its subcontractors, access to GTL policies that mirror the design and coverage of the AMLI limited medical policies currently being marketed . . . ."

[6] In June 2008, the Bureau of Insurance contacted GTL stating that it had come to the Bureau's attention that GTL was working with unapproved associations in Maine. In response, GTL sent an email to AMLI in late July instructing it to cease marketing new coverage in Maine until associations, naming NCE specifically, had been approved. However, policies continued to be sold and premiums attributed to GTL, of which GTL apparently was or should have been aware. GTL asserts that AMLI was responsible under the Agreement to ensure that NCE was approved as an association, but the record evidences that GTL knew in June or July 2008 that AMLI had not done so and that GTL then offered to do it itself, and, as a more general matter, that GTL could not depend on AMLI to comply with the terms of the Agreement.

[¶7]   Under the Agreement, AMLI retained responsibility for most of the administrative duties including marketing, underwriting, and premium billing.  The Agreement stated that AMLI would subcontract some of its duties to other parties and that AMLI would indemnify GTL for the actions of AMLI and its subcontractors.  The Agreement specifically identified two entities by name as AMLI subcontractors, which GTL accepted.

[¶8]   As GTL acknowledged at oral argument on this appeal, it negotiated the terms of the Agreement "word by word."  Despite the purported level of care in negotiating the Agreement, no entity identified in the Agreement—AMLI or the two named subcontractors—was licensed to perform third-party administrative services in Maine.  GTL claims that it relied on AMLI under the terms of the Agreement to ensure the necessary licensure.  However, GTL never took steps to verify that AMLI or either of its two named subcontractors were licensed in Maine.

[¶9]   The record indicates that AMLI subcontracted marketing duties in Maine to Cinergy.  Cinergy marketed and sold coverage under the Master Policy to individuals in Maine, including making sales to more than fifty Maine residents between February 2008 and October 19, 2008.  Over $80,000 in premiums was collected from Maine insureds from the sale of this coverage; GTL received its share pursuant to the Agreement.  Although GTL did not have actual notice when AMLI contracted marketing to Cinergy, the record contains testimonial evidence

showing that GTL knew as early as August 2008 that it was one of the insurers of the plan that Cinergy marketed and that Cinergy was involved, or that AMLI subcontracted or may have subcontracted with Cinergy to provide services.

[¶10]  Beginning in March 2008 and continuing through July 2008, Cinergy ran television ads in Maine that stated, in a brief display, that its advertised coverage was provided by AMLI, for whom GTL knew that it was the fronting carrier; that identified the number of the Master Policy issued by GTL to NCE; and that stated that coverage was offered through membership in NCE.  Then, as of September 2008, Cinergy television advertisements ran in Maine in which GTL was clearly, if somewhat quickly, named as the underwriter along with AMLI. According to the telephone sales script that Cinergy claims it used to market coverage under the Master Policy to one Maine insured in August 2008, Cinergy informed the insured, whose coverage became effective September 15, 2008, that "[t]he plan is offered by Cinergy Health, a licensed insurance agency, and underwritten by the Guarantee Trust Life Insurance Company, an AM Best rated insurance company."  Additionally, though the dates of his receipts are not indicated in the record, one Maine insured whose coverage was effective September 1, 2008, received statements for benefits paid that listed both GTL and Cinergy at the top.

[¶11]  On October 20, 2008, more than eight months after Cinergy began marketing coverage under the Master Policy, GTL appointed Cinergy as its producer agency pursuant to 24-A M.R.S. § 1420-M (2012), after which Cinergy sold additional coverage to Maine residents until mid-December 2008.  During this period, GTL also funded the payment of claims paid via a third-party claims payor. It is now undisputed that Cinergy repeatedly violated Maine insurance laws in the course of marketing the limited medical benefit insurance plan.

[¶12]  In July 2010, the Bureau of Insurance filed petitions, later amended, against GTL, Cinergy, and a named individual not at issue in this appeal.  As to GTL, the Bureau alleged that it violated 24-A M.R.S. §§ 1420-M(1), 2186(2),[7] and 2412(1-A) (2012), and that it was accountable pursuant to 24-A M.R.S. § 1445(1)(D) for Cinergy's insurance law violations.

[¶13]  The Superintendent held a two-day hearing in December 2010, received supplemental evidence and argument, and closed the record on January 21, 2011.  On February 23, 2011, the Superintendent timely issued an order extending the time to issue a decision due to the complexity of the proceeding, the magnitude of the record, and the important legal issues involved.  The Superintendent stated that "[b]est efforts will be made to issue a decision on or

---

[7]  Title 24-A M.R.S. § 2186(2) (2012) prohibits a person from committing a "fraudulent insurance act," defined as certain "acts or omissions," as specified in 24-A M.R.S. § 2186(1)(A) (2012), "when committed knowingly and with intent to defraud."

8

before Friday, March 4, 2011." No party objected to the delay at any time while the decision was pending.

[¶14] The Superintendent issued an extensive written decision on April 26, 2011, finding that Cinergy had committed multiple violations of the Maine Insurance Code. The Superintendent concluded that GTL is accountable for Cinergy's violations occurring after GTL appointed Cinergy its producer on October 20, 2008, a conclusion that GTL does not dispute. The Superintendent also concluded that GTL is accountable for Cinergy's actions from February 2008 until October 20, 2008, before GTL appointed Cinergy as its producer, pursuant to 24-A M.R.S. § 1445(1)(D). Finally, the Superintendent concluded that GTL had violated 24-A M.R.S. §§ 1420-M(1), 1902, and 2412(1-A)(B). The Superintendent imposed a civil penalty of $150,000 on GTL. GTL moved for rehearing and modification of the decision, which the Superintendent denied.

[¶15] GTL petitioned the Superior Court for review pursuant to M.R. Civ. P. 80C and 5 M.R.S. § 11001(1) (2012). The appeal was transferred to the Business and Consumer Docket on September 10, 2012.[8] The court entered judgment on January 3, 2013, in favor of the Superintendent with costs. GTL filed this timely appeal pursuant to 5 M.R.S. § 11008 (2012) and M.R. App. P. 2.

---

[8] Cinergy also appealed, but the Superior Court dismissed the appeal with prejudice by consent.

## II. LEGAL ANALYSIS

[¶16]   When the Superior Court acts in its appellate capacity pursuant to M.R. Civ. P. 80C, "we review a decision of the Superintendent directly for an abuse of discretion, error of law, or findings not supported by the evidence." *Bankers Life & Cas. Co. v. Superintendent of Ins.*, 2013 ME 7, ¶ 15, 60 A.3d 1272.

[¶17]   In reviewing the interpretation of a statute, we look first to its plain language, analyzing it "in order to effectuate the intent of the Legislature." *Eagle Rental, Inc. v. State Tax Assessor*, 2013 ME 48, ¶ 11, 65 A.3d 1278; *Bankers Life & Cas. Co.*, 2013 ME 7, ¶ 15, 60 A.3d 1272.   If the language is ambiguous, we "accord due consideration to the Superintendent's interpretation and application of technical statutes and regulations and will overturn the Superintendent's action only if the statute or regulation plainly compels a contrary result." *Bankers Life & Cas. Co.*, 2013 ME 7, ¶ 15, 60 A.3d 1272.

[¶18]   The Superintendent's factual findings are reviewed to determine whether they are "not supported by substantial evidence in the record." *Id.* ¶ 16. "In reviewing the findings, we will examine the entire record" to determine whether the Superintendent "could fairly and reasonably find the facts" as she did, "even if the record contains other inconsistent or contrary evidence." *Id.* "[W]e will affirm the findings of fact if there is any competent evidence in the record to support them." *Id.*

[¶19]  We address GTL's five issues on appeal in turn.

A.    GTL's Vicarious Liability for Cinergy's Misconduct

[¶20]  GTL argues that the Superintendent erred in finding it liable pursuant to 24-A M.R.S. § 1445(1)(D) for Cinergy's misconduct occurring before October 20, 2008, the date on which GTL appointed Cinergy as its producer.  GTL argues that, notwithstanding the plain language of 24-A M.R.S. § 1445(1)(D), sections 1445(3) (2012) and 1420-M(1) require that, to be liable for Cinergy's pre-appointment misconduct, GTL must then have had a common law agency relationship with Cinergy and that it did not.  In effect, GTL argues that, despite agreeing to serve as a front for an unlicensed carrier (AMLI), to do business in Maine, and receiving a share of premiums for coverage sold by the insurance producer that was marketing that coverage (Cinergy), it should not be held responsible for the improper acts of that insurance producer.

[¶21]  Section 1445(1)(D) states that "the insurer . . . [i]s accountable and may be penalized by the superintendent, as provided for in this Title, for the actions of its producers."[9]  *See generally Bankers Life & Cas. Co.*, 2013 ME 7, ¶ 17, 60 A.3d 1272 (noting that there is no requirement that the insurer have independently taken improper actions to be accountable under this section).  An

---

[9]  "'Insurer' includes every person engaged as principal and as indemnitor, surety or contractor in the business of entering into contracts of insurance."  24-A M.R.S. § 4 (2012).

"insurance producer" is "a person required to be licensed under subchapter II-A to sell, solicit or negotiate insurance." 24-A M.R.S. § 1402(5) (2012); *see also* 1 M.R.S. § 72(15) (2012) (stating that "person" may include a "body corporate").

[¶22]   In contrast to the preceding three paragraphs at 24-A M.R.S. § 1445(1)(A)-(C) (2012), which provide for an insurer's responsibilities with respect to its "*appointed* producers" (emphasis added), the fourth paragraph, the statute at issue here, section 1445(1)(D), makes an insurer accountable for "the actions of its producers." By not including the word "appointed" in section 1445(1)(D) when it did so in each of the preceding paragraphs, the Legislature's intent is unambiguous: an insurer is strictly liable for the actions of those who sell, solicit, or negotiate insurance of the insurer, whether or not the producer was formally appointed. Section 1445(1)(D)'s use of the phrase "its producers" suggests only that the insurer must know, or should know, that an entity or person is selling, soliciting, or negotiating its insurance product to impose liability on the insurer, but no more. Section 1445(3) does not alter the plain language of section 1445(1)(D).[10]

---

[10]   Title 24-A M.R.S. § 1445(3) (2012) provides, "Nothing in this chapter abrogates the common law principles of apparent or implied authority as available remedies or defenses."

GTL also cites to 24-A M.R.S. § 1420-M(1) for support that a common law agency relationship must exist before an insurance company can be held accountable for the acts of companies that sell, solicit, or negotiate insurance coverage provided by the insurer. We again disagree. Section 1420-M(1) states, "An insurance producer may not act as an agent of an insurer unless the insurance producer becomes an appointed agent of that insurer. An insurance producer who is not acting as an agent of an insurer is not required to become appointed." Despite the presence of the word "agent," this statute simply provides

12

[¶23] It is undisputed that Cinergy was selling, soliciting, or negotiating coverage under the Master Policy issued by GTL prior to its appointment and, as such, was GTL's producer from January or February 2008 to October 20, 2008. Although GTL argues that AMLI subcontracted with Cinergy without GTL's approval and that GTL thus did not know that Cinergy was the entity marketing its insurance coverage, GTL knew that insurance was being sold under its policy. GTL knew when it signed the Agreement, effective January 2008, that AMLI intended to subcontract marketing to other entities and that those entities were not or might not be licensed in Maine. GTL was therefore content to disregard the warning signs that the procedures in place were inadequate or unlawful, but nonetheless accepted business and the accompanying premiums while turning a blind eye to whether a producer working on its behalf was even licensed, much less marketing its coverage in compliance with the law.[11]

[¶24] Furthermore, considering the testimonial evidence in the record; GTL's receipt of a share of premiums from these pre-appointment sales; and the notice provided in Cinergy advertisements, including the identification of GTL by

that it is a violation for a producer to act as an insurer's producer unless appointed. It does not suggest that the insurer cannot be held accountable for the violations of an unappointed producer pursuant to section 1445(1)(D), whether or not a common law agency relationship is established, or that a producer cannot be determined to have been acting on behalf of an insurer even though unappointed.

[11] For example, in a letter to the Bureau dated January 7, 2009, GTL stated, "GTL does not have any agreement with Cinergy to market this plan of insurance. All marketing agents are handled through AMLI."

name, that ran during Cinergy's pre-appointment period, GTL cannot seriously argue that it was not on notice that Cinergy was acting on GTL's behalf pursuant to the Agreement with AMLI. The Superintendent properly held GTL accountable for Cinergy's misconduct before GTL formally appointed Cinergy as its producer agency.

[¶25]  To the extent that GTL relied on AMLI to identify its producers and ensure their compliance with Maine law, GTL may have a breach of contract claim against AMLI, but its effort to contract away its obligations as an insurer are independent from, and do not absolve GTL of, the liability imposed upon it pursuant to 24-A M.R.S. § 1445(1)(D).

B.  GTL's Liability for Failing to Appoint Cinergy

[¶26]  GTL argues that the Superintendent erred in finding it liable pursuant to 24-A M.R.S. § 1420-M(1), as alleged in the Bureau's amended petition, because that section places a duty only on producers (e.g., Cinergy) and not on insurers (e.g., GTL).[12]

[¶27]  Section 1420-M(1) states that an "insurance producer may not act as an agent of an insurer unless the insurance producer becomes an appointed agent of that insurer. An insurance producer who is not acting as an agent of an insurer is

---

[12]  GTL also argues that the Superintendent erred in finding it liable pursuant to 24-A M.R.S. § 1420-M(1) because, it asserts, Cinergy was not acting as GTL's agent prior to October 20, 2008. This issue has been addressed above. *See supra* n.10.

not required to become appointed." 24-A M.R.S. § 1420-M(1). Section 1420-M(1) expressly prohibits the producer from acting as the insurer's insurance producer until appointment. It also can be read, although it does not expressly state this, to create a duty on the part of the insurer to ensure that entities acting as its insurance producers are in fact appointed. The Superintendent interpreted section 1420-M(1) as imposing a duty on GTL, as the insurer, to file a notice of appointment for Cinergy before GTL accepted business that Cinergy sold, acting as its producer, and that GTL's failure to do so constituted a violation of this section. We give due consideration to the Superintendent's interpretation of this section as placing an affirmative duty on the insurer, concluding that section 1420-M(1) does not plainly compel a contrary result. *See Bankers Life & Cas. Co.*, 2013 ME 7, ¶ 15, 60 A.3d 1272.

[¶28] Additionally, reading section 1420-M(1) in the context of section 1420-M as a whole, the insurer unambiguously has a duty to undertake specific actions in order to "appoint a producer as its agent" before a producer may legally act on its behalf and the insurer can accept business sold by it. *See* 24-A M.R.S. § 1420-M(1)-(4) (2012); *Eagle Rental, Inc.*, 2013 ME 48, ¶ 11, 65 A.3d 1278 (stating that we review interpretation of a statute in the context of the whole statutory scheme to avoid absurd, illogical, or inconsistent results). We thus consider the entire statutory scheme in interpreting section 1420-M(1) even though

the Bureau's amended petition explicitly alleged only a violation of section 1420-M(1).

[¶29]  The Superintendent did not err in concluding that insurers may be liable pursuant to 24-A M.R.S. § 1420-M(1) and in holding GTL accountable for its failure to appoint Cinergy prior to October 20, 2008, when Cinergy was in fact acting as its producer and GTL was accepting business that Cinergy sold.

C.    GTL's Provision of Coverage Pursuant to 24-A M.R.S. § 2412(1-A)(B)

[¶30]  GTL argues that the Superintendent erred in finding that it violated 24-A M.R.S. § 2412(1-A)(B) because there was no evidence that GTL issued any certificate of coverage, and therefore no evidence that it provided coverage, to any Maine consumer, but that Cinergy instead issued AMLI certificates and coverage.[13]

[¶31]  Section 2412(1-A)(B) states, in relevant part, that an "insurer may not provide coverage to a resident of this State under a group or blanket policy or contract issued and delivered outside this State unless," for "association group policies" as defined by statute, "certificates of coverage to be delivered or issued for delivery in this State . . . [are] filed with the superintendent at least 60 days before any solicitation in this State, with sufficient information . . . to enable the

---

[13]  GTL also argues that it should not be found in violation of 24-A M.R.S. § 2412(1-A)(B) for coverage provided under the group policy it issued to NCE when NCE was an unapproved out-of-state association in Maine because, under the Agreement, it was AMLI's responsibility to get approval for the NCE policy and because GTL instructed AMLI that no new coverage was to be issued when it learned of that noncompliance.  Even assuming that GTL delegated responsibility under the Agreement to AMLI to ensure that NCE was a Maine-approved association, that does not relieve GTL of liability under section 2412(1-A)(B).

superintendent to determine whether the group satisfies the statutory requirements for [an] . . . association group." 24-A M.R.S. § 2412(1-A)(B)(1).

[¶32]  Under the plain language of section 2412(1-A)(B), the consequential fact for this appeal is whether GTL "provide[d] coverage" to Maine consumers before filing sufficient information to show that NCE satisfied statutory requirements.  We affirm the Superintendent's determination that it did.  First, despite evidence in the record that could lead to an alternate result, competent evidence supports the Superintendent's finding that GTL certificates of coverage were issued to Maine insureds.  *See Bankers Life & Cas. Co.*, 2013 ME 7, ¶ 16, 60 A.3d 1272.  This supports the conclusion that GTL provided coverage to Maine insureds under section 2412(1-A).  Regardless, section 2412(1-A) does not require that GTL have issued certificates of coverage to be liable under that section.  Section 2412(1-A) instead precludes an insurer from "provid[ing] coverage to a resident of this State" unless certain obligations have been met.

[¶33]  GTL has admitted that it "assumed responsibility for handling the claims and underwriting the insurance" for coverage in Maine under the Master Policy it issued to NCE.  Moreover, premiums from coverage sold under the Master Policy to Maine consumers were attributed to GTL and GTL received a portion of those premiums; pursuant to Cinergy's telephone sales script, Cinergy informed prospective Maine insureds that the coverage it was selling was

underwritten by GTL; GTL paid out claims to Maine residents covered under the Master Policy and insureds received statements of benefits that named GTL as the payor; and Cinergy ads referenced the number of the Master Policy in ads beginning in March 2008 and explicitly named GTL as a plan underwriter in ads beginning in September 2008. Accordingly, the Superintendent did not err in concluding that GTL "provide[d] coverage" to Maine residents and is liable under section 2412(1-A)(B).[14]

D.     Liability Pursuant to 24-A M.R.S. § 1902

[¶34]   GTL argues that the Superintendent erred in concluding that it violated 24-A M.R.S. § 1902 because the Bureau's petition did not allege a violation of that section, but alleged, as pertinent to this issue, a violation of 24-A M.R.S. § 2186(2), referencing section 2186(1)(A)(6) and (7) (2012) as well. GTL argues that section 1902 cannot be considered a "lesser included offense" of or covered by the allegation of a violation of section 2186(1)(A)(6), (2) and that section 1902 is applicable only to insurance administrators and therefore cannot apply to GTL.[15]

---

[14]  GTL asserts that the argument the Superintendent makes differs from the allegations in the Bureau's petition, but the Bureau sufficiently presented this basis for liability in its petition, and the Superintendent made relevant findings and conclusions.

[15]  GTL also argues that it should not be penalized pursuant to 24-A M.R.S. § 1902 for AMLI's misconduct because AMLI breached the parties' Agreement when it acted as an unlicensed administrator, and, regardless, the penalty for a violation of section 1902 is limited to $1000, although we note that section 1902 plainly caps the penalty only with respect to criminal fines. These arguments are without merit, and we do not address them further.

18

[¶35] Due process requires that a party to an administrative action be on notice as to the statutory provisions and issues involved in an adjudicatory proceeding sufficient to provide an opportunity to adequately prepare and present evidence. *See* 5 M.R.S. § 9052(1), (4) (2012) (stating that notice of hearing shall include a "reference to the particular substantive statutory and rule provisions involved" and a "short and plain statement of the . . . matters asserted"); *see also Berry v. Me. Pub. Utils. Comm'n*, 394 A.2d 790, 793 n.4 (Me. 1978) (indicating that due process in administrative proceedings requires that the party have notice of the issues and relevant statutory provisions to adequately prepare and "present evidence on any issue relevant to that proceeding").

[¶36] The Bureau's petition and amended petition alleged that GTL violated 24-A M.R.S. § 2186(1)(A)(6), (7), and 2186(2) for fraudulently contracting with the unlicensed AMLI to act as the administrator under the Master Policy. The Superintendent concluded that there was insufficient evidence to support a finding of fraudulent intent to support a violation of section 2186. However, the Bureau's petition also cited and summarized section 1902 and alleged facts sufficient to support a violation of that provision. Section 1902 provides in relevant part that "[a] person may not act as or profess to be an administrator after August 1, 1990, unless licensed under this chapter." GTL was sufficiently on notice under the petition, as incorporated by reference in the Superintendent's order for

adjudicatory proceeding and notice of hearing, that it could be held accountable pursuant to section 1902 for contracting with an unlicensed administrator. And, contrary to GTL's contentions, the law and evidence support the Superintendent's determination of liability for violation of section 1902. *See* 24-A M.R.S. § 1902; *see also* 24-A M.R.S. § 1906(10) (2012) (deeming the acts of an insurance administrator to be those of the insurer); *Eagle Rental, Inc.*, 2013 ME 48, ¶ 11, 65 A.3d 1278.

E.     Timeliness of the Superintendent's Decision

[¶37]   Lastly, GTL argues that the Superintendent's decision must be vacated because she exceeded her statutory authority and jurisdictional limits when she failed to comply with the timing requirements set forth in 24-A M.R.S. § 235(2) (2012) by issuing her decision weeks after the already-extended deadline without good cause shown.

[¶38]   Section 235(2) states that the Superintendent "shall make [her] order on hearing" "[w]ithin 30 days after termination of a hearing . . . or within such further reasonable period as the superintendent for good cause may require . . . ." 24-A M.R.S. § 235(2). In her timely order of February 23, 2011, the Superintendent showed good cause for issuing her decision after the thirty-day period. Though she expressed an intent to issue a decision by March 4, 2011, this was not a definite date, and the Superintendent did not issue an untimely decision

pursuant to the plain language of section 235(2) and her February 2011 order when she issued her decision on April 26, 2011.

[¶39] Regardless, imperfect compliance with section 235(2) is not grounds to vacate a superintendent's decision. Section 235(2) is directory and not mandatory, *see Anderson v. Comm'r of the Dep't of Human Servs.*, 489 A.2d 1094, 1097-98 (Me. 1985), and deviation from the statutory requirement is not grounds for dismissal of the petition or vacation of the decision. The Administrative Procedure Act instead provides a remedy to parties "aggrieved by the failure" of an agency to act. 5 M.R.S. § 11001(2) (2012). GTL did not avail itself of that remedy.

The entry is:

> Judgment affirmed.

---

**On the briefs:**

> Sidney St. F. Thaxter, Esq., David P. Silk, Esq., and Benjamin M. Leoni, Esq., Curtis Thaxter LLC, Portland, for appellant Guarantee Trust Life Insurance Company
>
> Janet T. Mills, Attorney General, and Andrew L. Black, Asst. Atty. Gen., Office of Attorney General, Augusta, for appellee Superintendent of Insurance

**At oral argument:**

Benjamin M. Leoni, Esq. for appellant Guarantee Trust Life Insurance Company

Andrew L. Black, Asst. Atty. Gen. for appellee Superintendent of Insurance

Business and Consumer Docket docket number AP-12-9
FOR CLERK REFERENCE ONLY