STATE OF MAINE
CUMBERLAND, SS.

BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-AP-16-15 ✓

PENOBSCOT ENERGY RECOVERY
COMPANY, LP,
USA ENERGY GROUP, LLC, and
EXETER AGRI-ENERGY, LLC,

     Petitioners,

     v.

MAINE DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

     Respondent,

     and

MUNICIPAL REVIEW
COMMITTEE, INC., and
FIBERIGHT, LLC,

     Interveners.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON PETITIONERS'
RULE 80C APPEAL**

Petitioners Penobscot Energy Recovery Company, LP ("PERC"), USA Energy Group, LLC ("USA EG"), and Exeter Agri-Energy, LLC ("Exeter") (collectively "Petitioners") seek judicial review of final agency action by the Maine Department of Environmental Protection ("DEP") pursuant to the Maine Administrative Procedures Act (the "APA"), 5 M.R.S. § 11001 *et seq.*, and Maine Rule of Civil Procedure 80C. For the reason discussed below, Petitioners' appeal of final agency action is denied. The decision of DEP is affirmed.

## I.    BACKGROUND

PERC is a Maine limited partnership formed in 1983 that currently operates a waste-to-energy facility located in Orrington, Maine that process municipal solid waste ("MSW). (Pet. ¶ 3.) USAE is a Minnesota company and the managing general partner of the PERC facility. (*Id.*

1

¶ 4.) Exeter is a Maine company in the business of creating energy and other products from organic materials located in Exeter, Maine. (*Id.* ¶ 6.)

Intervener Fiberight, LLC ("Fiberight") is a privately held company founded in 2007 that focuses on transforming post-recycled MSW and other organic materials into renewable biofuels. (R. S-1 at 2.) Fiberight currently operates a demonstration facility in Lawrenceville, Virginia. (*Id.*) Intervener Municipal Review Committee, Inc. ("MRC") is a Maine non-profit corporation comprised of 187 municipalities and inter-municipal entities located in central, eastern, and northern Maine. (*Id.* at 1.) MRC was formed in 1991 to help manage the disposal of MSW for its members. (R. S-1 at 1, S-85.)

MRC's member municipalities currently send their MSW to the PERC facility for processing. (R. S-1 at 1; S-29 Attach. 1.) The agreements between MRC's member municipalities and PERC are set to expire on March 31, 2018. (R. S-29 Attach. 1.) MRC anticipates that the agreements with PERC will not be extended or replaced with new agreements. (R. S-4.) Since June 2013, MRC has sought to develop a MSW facility to replace PERC. (*Id.*) In February 2015, MRC entered into a Development Agreement with Fiberight to develop a mixed-MSW processing and conversion facility. (*Id.*) Pursuant to the Agreement, MRC is responsible for securing fee ownership or long-term control of the project site and leasing the site to Fiberight. (*Id.*) Fiberight is responsible for the design, engineering, acquisitions of permits, procurement of equipment, financing, construction, start-up, testing, commissioning, operation, and maintenance of the facility. (*Id.*)

In June 2015, MRC and Fiberight (collectively "Applicants") filed joint applications with DEP for a solid waste processing license, an air emission license, and a Natural Resources Protection Act ("NRPA") permit to develop and operate a new regional MSW processing and

recycling facility located in Hampden, Maine. (R. S-29, A-2, L-5.) MRC also filed an application with DEP for a stormwater permit for the proposed facility. (R. L-4.) The proposed facility will consist of a 144,000 square foot building that will provide for receiving, storing, and processing and/or converting MSW into recyclables, renewable fuels, and residues for potential recycling and/or disposal off-site. (R. S-1 at 6.) According to the application, the proposed Fiberight facility will utilize a variety of processes and proprietary technology to separate and convert MSW into several different categories: (1) recyclables to be sold on the open commodities market; (2) Post hydrolysis solids ("PHS") to be used as fuel in on-site biomass boilers; (3) biomethane to be piped to an adjacent natural gas pipeline; (4) biomass fuel (i.e., sugar) which will be sold on the open commodities market; and (5) resultant residue waste that will be removed via screens and transferred to a landfill facility. (R. S-29 Attach. 13.)

MRC and Fiberight's applications were accepted for processing on July 15, 2015. (R. S-37a.) DEP received several requests for a public hearing on the applications, which DEP denied. (R. S-45, S-46, S-47, S-48, S-49.) A public meeting was held on November 19, 2015, in order to provide the public with an overview of the proposed facility and an opportunity for comment. (R. S-62, S-72.) During the review process, DEP requested, and Applicants submitted, additional information regarding their applications. (R. S-58, S-75, S-93, S-98.) DEP received numerous written comments from municipalities, organizations, and members of the public regarding the applications for solid waste and air emission licenses. (R. S-53, S-55, S-57, S-66, S-67, S-74, S-83, S-86, S-87, S-100, A-40, A-41, A-52; Supp. R. 138.)

DEP released drafts of the solid waste and air emission licenses on June 13, 2016. (R. S-1 at 3, S-108, A-54.) DEP received detailed written comments regarding the draft licenses from several members of the public, including PERC and USAE. (R. S-1 at 3, S-113, S-114, S-115,

3

S-116, S-117, S-118, S-119, S-120, S-122.) DEP issued final solid waste, air emission, and stormwater/NRPA licenses to Applicants on July 14, 2016. (R. S-1, A-1, L-1.)

PERC, USAE, and Exeter filed a petition for review of final agency action by DEP on August 12, 2016. This case was transferred to the Business and Consumer Court on September 20, 2016. The court granted Fiberight's and MRC's motions to intervene on September 28, 2016. Petitioners filed a motion for the taking of additional evidence on November 3, 2016, which the court denied on January 6, 2017.

Petitioners filed their brief pursuant to Rule 80C on December 23, 2016. Petitioners' brief presents five challenges to DEP's granting of the licenses to Applicants. (Pet'rs Br. 12-18.) DEP, MRC, and Fiberight each filed a response brief on January 20, 2017. In their response briefs, both Fiberight and MRC assert that Petitioners lack standing to seek judicial review of DEP's action pursuant to Rule 80C and the APA.[1] Petitioners filed their reply on February 6, 2017. Oral argument was held on February 27, 2017.

## II.    STANDARDS OF REVIEW

### A.    Standing

Whether a petitioner has standing is "significantly affected by the unique context of the claim." *Lindemann v. Comm'n on Governmental Ethics & Election Practices*, 2008 ME 187, ¶ 8, 961 A.2d 538. "The right to appeal from an administrative decision is governed by statute. Whether a party has standing depends on the wording of the specific statute involved." *Nelson v. Bayroot, LLC*, 2008 ME 91, ¶ 9, 953 A.2d 378 (internal citation omitted).

DEP's governing statute provides, "...**any person aggrieved** by any order or decision of the board or commissioner may appeal to the Superior Court." 38 M.R.S. § 346(1) (emphasis

---

[1] DEP did not address Petitioners' standing in its response brief. At oral argument, DEP took no position on whether Petitioners had standing to seek judicial review.

4

supplied). The statute further provides that any appeal to the Superior Court must be taken in accordance with 5 M.R.S. §§ 11001-08 of the APA. *Id.* Section 11001 of the APA similarly provides, "**any person who is aggrieved** by final agency action shall be entitled to judicial review thereof in the Superior Court in the manner provided by this subchapter." 5 M.R.S. § 11001(1) (emphasis supplied).

A person is "aggrieved" within the meaning of the APA if that person has suffered a "particularized injury," meaning "the agency action operated prejudicially and directly upon the party's property, pecuniary or personal rights." *Nelson*, 2008 ME 91, ¶ 10, 953 A.2d 378 (citation omitted). "The injury suffered must be distinct from any experienced by the public at large and must be more than an abstract injury." *Id.* The court examines the issue of standing in context in order "to determine whether the asserted effect on the party's rights genuinely flows from the challenged agency action." *Id.* "Being affected by a governmental action is insufficient to confer standing in the absence of any showing that the effect is an injury." *Lindemann*, 2008 ME 187, ¶ 15, 961 A.2d 538 (internal citation and quotation marks omitted). Once it is determined that a petitioner has standing as an aggrieved person, the petitioner may raise any issue affecting the validity of an agency's action. *Anderson v. Comm'r of Dep't of Human Servs.*, 489 A.2d 1094, 1097 (Me. 1985).

Because both § 346 of DEP's statute and § 11001 of the APA state that any "person" aggrieved by an agency action may appeal to this court, rather than any "party," a petitioner need not have participated at the agency level in order to have standing to appeal that decision to this court. Both DEP's statute and the APA allow "a non-participant with a direct and substantial interest to appeal to the Superior Court from a decision by a state administrative agency." Alexander, *Maine Appellate Practice* § 204(a) at 205 (4th ed. 2013).

5

B.    Review of Final Agency Action

When acting in an appellate capacity pursuant to Rule 80C and the APA, the court reviews an agency's decision for "abuse of discretion, error of law, or findings not supported by the evidence." *Guar. Tr. Life Ins. Co. v. Superintendent of Ins.*, 2013 ME 102, ¶ 16, 82 A.3d 121. The standard for review of final agency action is provided by § 11007 of the APA. M.R. Civ. P. 80C(c). The court may reverse or modify any agency determination if the agency's findings, inferences, conclusions, or decisions: (1) violate constitutional or statutory provisions, (2) exceed the agency's statutory authority, (3) are made upon unlawful procedure, (4) are affected by bias or error of law, (5) are unsupported by substantial evidence in the record, or (6) are arbitrary, capricious, or an abuse of discretion. 5 M.R.S. § 11007(4)(C). The court may also remand the case for further proceedings, findings of fact or conclusions of law, or direct the agency to hold such proceedings or take any action the court deems necessary. *Id.* § 11007(4)(B).

Statutory construction is a question of law that the court reviews *de novo*. *Champlain Wind, LLC v. Bd. of Envtl. Prot.*, 2015 ME 156, ¶ 15, 129 A.3d 279. The court looks to the plain language of the statute in order to effectuate the Legislature's intent. *Guar. Tr. Life Ins. Co.*, 2013 ME 102, ¶ 17, 82 A.3d 121. The court will generally defer to an agency's construction of the statutes it administers "unless the statute plainly compels a contrary result." *Champlain Wind, LLC*, 2015 ME 156, ¶ 15, 129 A.3d 279. The court reviews an agency's interpretation of the statute it administers only to determine whether the agency's conclusions are unreasonable, unjust, or unlawful. *Id.* An agency's interpretations of its own rules, on the other hand, are given "considerable deference." *Friends of the Boundary Mts. v. Land Use Regulation Comm'n*, 2012 ME 53, ¶ 6, 40 A.3d 947. The court will not be set aside an agency's interpretation of its

6

own rules "unless the rule plainly compels a contrary result, or the rule interpretation is contrary to the governing statute." *Id.*

An agency's findings of fact must be supported by substantial evidence in the record and cannot be based on unsupported speculation. *Hannum v. Bd. of Envtl. Prot.*, 2003 ME 123, ¶ 15 n.6, 832 A.2d 765. To be supported by substantial evidence, the agency's findings of fact must be supported by "such relevant evidence as a reasonable mind might accept as adequate to support the resultant conclusion." *Sinclair Builders, Inc. v. Unemployment Ins. Comm'n*, 2013 ME 76, ¶ 9, 73 A.3d 1061 (internal citation and quotation marks omitted). The court will not substitute its own judgment for that of the agency merely because the record could support more than one conclusion. *Abrahamson v. Sec'y of State*, 584 A.2d 668, 670 (Me. 1991).

An agency's decision is arbitrary and capricious if it is willful, unreasoning, and without consideration of facts or circumstances. *Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶ 8, 870 A.2d 566 (citation omitted).

An agency abuses its discretion when "the decisionmaker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law." *Friends of Me.'s Mts. v. Bd. of Envtl. Prot.*, 2013 ME 25, ¶ 11, 61 A.3d 689 (internal quotation marks and citation omitted).

## III. ANALYSIS

### A. Petitioners' Standing

MRC and Fiberight assert that Petitioners lack standing to seek judicial review of DEP's action because they have not asserted a "particularized injury."[2] (MRC Br. 6; Fiberight Br. 4.) In their petition for review, Petitioners assert:

---

[2] MRC also asserts that Exeter has no standing to bring this appeal because, unlike PERC and USAE, Exeter did not participate in the administrative proceedings before DEP. (MRC Br. 5-6.) As discussed

7

The issuance of these permits and the development of this facility has the potential to change the solid waste disposal landscape in a significant portion of the State of Maine and will have impacts lasting for decades. Specifically, this new facility seeks to replace the existing waste-to-energy system being used by a large number of municipalities with untested technology.

(Pet. 1.) Petitioners' further assert that the proposed Fiberight facility "is intended to serve the same municipalities currently being served by PERC and will directly impact PERC's business and viability." (*Id.* ¶ 5.) Petitioners assert that the Fiberight facility will also impact the industry and market in which Exeter operates. (*Id.* ¶ 6.)

In their brief, Petitioners allege that "the lure of the Fiberight facility has caused many of the MRC's member municipalities to sign on to the project for their post-2018 waste, instead of continuing to send their waste to the existing PERC waste-to-energy facility." (Pet'rs Br. 1.) Petitioners allege, "This will inevitably impact the economics of the solid waste industry in the state and the relevant markets, and, if the plant does not come to fruition, could have serious impacts on the environment of the state." (*Id.*)

In their reply brief, Petitioners further aver that they have suffered or will suffer a particularized injury because, "All Petitioners are current members of the industries in which the Fiberight facility will operate and have an interest in ensuring that regulatory requirements are fairly and completely enforced against all participants." (Pet'rs Reply Br. 10.) Petitioners' argue "they have an interest in ensuring that all members of that industry are subject to the same stringent licensing process and standards and that new entrants are not receiving treatment that will permit them to unfairly compete." (*Id.*) Petitioners reiterate that PERC is a "direct and current competitor" to the proposed Fiberight facility and that the granting of the licenses has

---

above, § 346 of DEP's statute and § 11001 of the APA state that any "person" aggrieved by an agency action may appeal to this court. 38 M.R.S. § 346(1); 5 M.R.S. § 11001(1). Thus, under both DEP's statute and the APA, "a non-participant with a direct and substantial interest" may seek judicial review of a DEP action in the Superior Court. *See* Alexander, *Maine Appellate Practice* § 204(a) at 205.

8

already had, and will continue to have, a direct impact on PERC's contractual relationships with municipalities and its business, affecting PERC's property and pecuniary rights. (*Id.* at 10-11.)

Petitioners' assertion that, if the Fiberight facility does not come to fruition, it "could have serious impacts on the environment of the state" is not a sufficiently particularized injury. The alleged injury is theoretical at this stage and indistinguishable for any injured potentially suffered by the public at large. *See Nelson*, 2008 ME 91, ¶ 10, 953 A.2d 378. Petitioners have not demonstrated how the theoretical environmental harm directly and prejudicially affects their "property, pecuniary or personal rights."

Petitioners primarily argue that DEP's issuance of the licenses to Applicants will increase competition in the MSW industry and harm their businesses. Our Law Court has previously recognized competing businesses as having standing to appeal an agency action in two types cases. First, our Law Court has held that a competitor has standing under Rule 80C and the APA to challenge actions by the Financial Authority of Maine ("FAME") because the agency's governing statute requires FAME to consider the interests of competing businesses before authorizing municipal bonds. *Hammond Lumber Co. v. Fin. Auth. Of Me.*, 521 A.2d 283, 286-87 (Me. 1987) (citing 10 M.R.S. § 1063(1)-(2)). Thus, the interests of competing businesses were expressly protected by the governing statute. *Id.; see also Nemon v. Summit Floors, Inc.*, 520 A.2d 1310, 1311-13 (Me. 1987); *Harold D. Smith & Sons, Inc. v. Fin. Auth. of Me.*, 543 A.2d 814, 816 n.2 (Me. 1988). In the present case, none of DEP's applicable statutes or rules requires DEP to consider the interests of a competing business before issuing licenses to a solid waste facility. *See* 38 M.R.S. §§ 341-A(1), 480-D, 581, 1310-N; 06-096 C.M.R. ch. 400 §§ 3-4 (Apr. 6, 2015), 06-096 C.M.R. ch. 115 § 4 (Dec. 1, 2012). Thus, the interests of competing businesses are not expressly protected by the applicable statutes or rules in the case.

9

Second, in *Bradbury Memorial Nursing Home v. Tall Pines Manor*, the then-applicable Maine Certificate of Need Act required the Department of Human Services ("DHS") to issue a Certificate of Need ("CON") before a nursing home could be constructed. 485 A.2d 634, 637 (Me. 1984). Bradbury Memorial, a competing nursing home facility, sought judicial review of DHS's issuance of a CON to Tall Pines Manor. *Id.* at 637-38. Regarding Bradbury Memorial's standing, the Law Court stated:

> In addition to meeting the statutory requirements, plaintiff must also demonstrate that the Department's action caused plaintiff a particularized injury. ... The purposes of the Certificate of Need Act include regulation of the distribution of health care facilities so as to avoid unnecessary duplication and wasted capital expenditures. 22 M.R.S.A. §§ 302(2)(C), (D).[3] **The Act reflects a legislative purpose to regulate competitive interests, and thus an injured competitor has standing to require compliance with the law.** ... As an existing nursing home in the Belfast area, Bradbury Memorial suffered a direct and particularized injury when the Department issued a CON for the construction of 70 additional beds in the same city to a competitor. ... Thus, plaintiff has standing to appeal the Department's refusal to reconsider its issuance of a CON to Tall Pines.

*Id.* at 638 (internal citations omitted) (emphasis and footnote supplied).

Like the statute in *Bradbury Memorial*, DEP's waste management statute "reflects a legislative purpose to regulate competitive interests." DEP's solid waste management statute declares:

> **The Legislature finds that it is in the best interests of the State to prefer waste management options with lower health and environmental risk and to ensure that such options are neither foreclosed nor limited by the State's commitment to disposal methods.** The Legislature declares that it is in the public interest to aggressively promote waste reduction, reuse and recycling as the preferred methods of waste management.

---

[3] Title 22 M.R.S. § 302(2)(C)-(D) provided that the purpose of the Maine Certificate of Need Act was to:

...

C.       Avoid unnecessary duplication in health facilities and health services to ensure that only those facilities that are needed will be built or modified;

D.       Assure that state funds are not used to support unnecessary capital expenditures made by or on behalf of health care facilities; ...

22 M.R.S. § 302(2)(C)-(D) (1978) (repealed 2001).

The Legislature finds that environmentally suitable sites for waste disposal are in limited supply and represent a critical natural resource. **At the same time, new technologies and industrial developments are making recycling and reuse of waste an increasingly viable and economically attractive option** which carries minimal risk to the State and the environment and an option which allows the conservation of the State's limited disposal capacity.

The Legislature further finds that needed municipal waste recycling and disposal facilities have not been developed in a timely and environmentally sound manner because of diffused responsibility for municipal waste planning, processing and disposal among numerous and overlapping units of local government. The Legislature also finds that direct state action is needed to assist municipalities in separating, collecting, recycling and disposing of solid waste, and **that sound environmental policy and economics of scale dictate a preference for public solid waste management planning and implementation on a regional and state level.**

38 M.R.S. § 1302 (emphasis supplied).

Like 22 M.R.S. § 302(C)-(D) cited in *Bradbury Memorial*, § 1302 of DEP's solid waste management statute expresses the Legislature's general intent to regulate the competitive solid waste disposal industry to ensure that sound solid waste management policies are implemented across the state. Thus, like in *Bradbury Memorial*, Petitioners in this case, as operators of competing facilities, have an interest in ensuring that DEP properly enforce, and Applications comply with, all pertinent statutes and rules. Therefore, like in *Bradbury Memorial*, Petitioners have standing to challenge DEP's action pursuant to the APA and Rule 80C.

B.    Petitioners' Challenges to DEP's Action

On appeal, Petitioners' raise five challenges to DEP's issuances of the licenses to Applicants: (1) DEP erred in finding that Fiberight had demonstrated sufficient financial ability; (2) DEP erred in finding that Applicants had demonstrated sufficient technical ability; (3) DEP erred in issuing the air emission license without making a determination whether PHS is "waste" or "non-waste" under federal regulations; (4) DEP erred in finding that the proposed Fiberight

11

facility was consistent with Maine's solid waste hierarchy; and (5) DEP erred by declining to hold a public hearing. (Pet'rs Br. 11-18.) The court addresses each challenge in turn.

### 1. *Fiberight's Financial Ability*

Pursuant to DEP's solid waste management statute, applicants for a solid waste facility license must have the "financial and technical ability to develop the project in a manner consistent with state environmental standards and with the provisions of this chapter." 38 M.R.S. § 1310-N(2-F)(A). DEP's solid waste rules similarly provide, "The applicant must have the financial ability to design, construct, operate, maintain, close and (if applicable) accomplish post-closure care of the solid waste facility in a manner consistent with all applicable requirements." 06-096 C.M.R. ch. 400 § 4(B)(1)(a). In order to demonstrate financial ability, DEP's solid waste management rules provide:

> The application must include evidence that affirmatively demonstrates that the applicant has the financial ability to undertake the proposed project, including the following information, when appropriate:
>
> (a) Accurate cost estimates for the design, construction, operation, maintenance, closure and (if applicable) post-closure care of the solid waste facility; and
>
> (b) Evidence that funds are or will be available to design, construct, operate, maintain, close and (if applicable) accomplish post-closure care of the solid waste facility, or to contract for the same, including the following:
>
> (i) When a financial institution is the funding source, the application must include:
>
> a. A letter from a financial institution, governmental agency, or other funding agency indicating a commitment to provide a specified and sufficient amount of funds and the uses for which the funds may be utilized; or
>
> b. **In cases where funding is required but there can be no commitment of money until approvals are received, a letter of "intent to fund" from the appropriate funding institution. Evidence of financing must be provided prior to project construction.**

(ii) When self-financing is a funding source for the solid waste facility, the application must include:

    a.     The most recent corporate annual report indicating availability of sufficient funds to finance the proposed project, through self-financing, together with explanatory material interpreting the report;

    b.     Evidence that funds are available and have been set aside for completion of the proposed project; or

    c.     If the applicant is a governmental entity, evidence that the entity has the bonding or other capacity to finance the proposed project.

*Id.* § 4(B)(2) (emphasis supplied).

In issuing the solid waste license, DEP found that Fiberight will be responsible for the costs of "site development, foundations, concrete and building construction, machinery and equipment, steel, mechanical and electrical installation, engineering, permits and project management." (R. S-1 at 8.) DEP found that total estimated costs for development and construction of the facility to be $66,976,786. (*Id.*) DEP also found Fiberight will be responsible for the annual operation and maintenance costs of the facility and the costs of closure, estimated to cost another $12,700,000. (*Id.*) According to DEP, Fiberight provided adequate evidence of financial ability to design, construct, operate, maintain, and close the proposed facility primarily in the form of a "letter of 'Intent to Fund'" from Covanta Energy, LLC ("Covanta"), as well as additional "letters of 'Intent to Fund'" from DTE Energy ("DTE") and Argonaut Private Equity ("Argonaut"). (*Id.* at 8-9.) DEP conditioned its finding of financial ability upon Applicants submitting "finalized financial documents for the construction and operation of the proposed processing facility" to DEP "within 30 days of receipt and prior to beginning construction of the proposed processing facility." (*Id.* at 9, 32.)

13

Petitioners assert the letters from Covanta, DTE, and Argonaut are insufficient evidence of financial ability because (1) none of the letters mention the $12,700,000 in annual operations, maintenance, and closure costs, (2) there is no evidence in the record of Fiberight's ability to self-fund, and (3) the three letters are not "letters of 'intent to fund'" permitted under § 4(B)(2)(b)(i)(b) of DEP's solid waste management rules. (Pet'rs Br. 12-14.) Petitioners further asserts that DEP's error in accepting the letters as sufficient evidence of financial ability is not remedied by conditioning its approval upon submission of finalized documents before construction.[4] (*Id.* at 14.)

Regarding the letters from Covanta, DTE, and Argonaut, Petitioners argue the three letters are merely "expressions of interest in the project" and do not represent "a firm commitment by a financial institution to a specific dollar amount" that is typically required by DEP when the funders' commitments are contingent on approval of the project. (*Id.* at 12-14) (quoting R. S-122). Petitioners argue that the letters also fail to comply with § 4(B)(2)(b)(i)(b) because the letters condition funding on the completion of due diligence in additional regulatory approval. (Pet'rs Br. 12; Pet'rs Reply Br. 13.)

The letter from Covanta to DEP, dated December 18, 2015, states in relevant part:

**Covanta Energy, LLC is engaged with Fiberight to support the development, financing, construction and operation of the Project,** ... Covanta conducted a review of financial projections related to the Project and we executed a term sheet for a long-term strategic partnership with Fiberight which starts with the Project.

---

[4] In a footnote to their brief, Petitioners also assert "there is a serious question as to whether the cost estimates cited by MDEP are accurate," and that "MDEP failed to examine the accuracy of the costs estimates." (Pet'rs Br. 14 n.5.) However, Petitioners did not actually challenge DEP's findings of fact regarding the estimated costs of the Fiberight facility in their brief. (*Id.* at 12-14.) In their reply, Petitioners assert for the first time that DEP's finding that the proposed facility would cost an estimated $66,976,786 to develop and construct and another $12,700,000 to maintain, operate, and close were an abuse of discretion and not supported by substantial evidence. (Pet'rs Reply Br. 12.) Contrary to Petitioners' argument, DEP's findings regarding the cost estimates were supported by substantial evidence in the record and do not constitute an abuse of discretion. (R. S-29 Attach. 7.)

We have reviewed the proposed budget for the project…, totaling approximately $67 million, and we can confirm that we are interested in supporting Fiberight with project finance in the form of an equity investment in the Project.

This letter is not intended to be a binding commitment to provide financing. A binding financing commitment is subject to successful completion of due diligence activities, including, but not limited to, the Project receiving relevant waste permits from Maine DEP, and Fiberight entering into an acceptable waste supply agreement with MRC Maine and its charter communities which, as we understand, is very close to completion.

(R. S-82) (emphasis supplied). The letter from DTE to DEP, dated June 11, 2015, is entitled

"Fiberight LCC [sic] – Letter of Intent to Fund". (R. S-28.) The letter similarly states in

relevant part:

DTE Energy Services is writing this letter to express our interest in funding Fiberight LLC's proposed advanced waste facility to be located in Hampden, ME (the "Project") in the event that our due diligence activities described herein prove satisfactory.
…
We have reviewed the proposed budget for the project… totaling approximately $67 million and we can confirm that we would have the financial capacity to provide the required financing in the event that the project proves viable.

This letter is not intended to be a binding commitment to provide financing. A binding financing commitment is subject to our successful completion of due diligence activities including, but not limited to, the Project receiving relevant waste permits from Maine DEP and Fiberight entering into an acceptable waste supply agreement with MRC Main [sic] and its charter communities as well as the approval of our Board of Directors. We understand that evidence of financing must be provided prior to project construction.

(Id.) (emphasis supplied). The letter for Argonaut to DEP, dated June 17, 2015, also states in

relevant part:

We have reviewed the proposed budget for the project… totaling approximately $67 million, and we can confirm that we are interested in providing the required project finance.

This letter is not intended to be a binding commitment to provide financing. A binding financing commitment is subject to our successful completion of due diligence activities including, but not limited to, the Project receiving relevant

15

waste permits from Maine DEP and the Sponsoring Parties entering into an acceptable waste supply agreement with MRC Maine and its charter communities.

(*Id.*) (emphasis supplied).

Petitioners assert that none of the above letters constitute a "letter of 'intent to fund'" under § 4(B)(2)(b)(i)(b). (Pet'rs Br. 12-14.) As discussed above, an agency's interpretation of its own rule must be given "considerable deference" and will not be set aside "unless the rule plainly compels a contrary result, or the rule interpretation is contrary to the governing statute." *Friends of the Boundary Mts.*, 2012 ME 53, ¶ 6, 40 A.3d 947. Petitioners have not pointed to any rules or statutory provisions compelling a contrary interpretation. (Pet'rs Br. 12-14.) Neither DEP's solid waste statutes nor its rules define what constitutes a "letter of 'intent to fund'" under § 4(B)(2)(b)(i)(b). Moreover, nothing in § 4(B)(2)(b)(i)(b) expressly states that a "letter of 'intent to fund'" may not contain additional conditions beyond regulatory approval. Therefore, the court must defer to the agency's interpretation of what constitutes a "letter of 'intent to fund'" under § 4(B)(2)(b)(i)(b). Because nothing in the rules or statute plainly compels a contrary interpretation, DEP did not commit an error of law or abuse its discretion in accepting the letters from Covanta, DTE, and Argonaut as "letters of 'intent to fund'" under § 4(B)(2)(b)(i)(b).[5]

---

[5] Additionally, the Law Court has previously held that letters from financial institutions expressing a general interest in funding wind energy projects demonstrated the institutions' "intent to fund" and were evidence of applicants' financial ability under 38 M.R.S. § 484(1). *Martha A. Powers Trust v. Bd. of Envtl. Prot.*, 2011 ME 40, ¶¶ 3, 16, 15 A.3d 1273 (a letter stating that a bank was "a likely candidate to provide debt financing for the Project" was evidence of an applicant's financial ability (internal quotation and citation omitted)); *Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶¶ 3, 28, 15 A.3d 1263 (a letter stating, "although the bank was not providing a binding commitment to [the applicant], it intended to provide financing for the Project subject to certain conditions" sufficiently demonstrated the bank's "intent to fund" (internal quotation and citation omitted)). Although these cases do not address the statute and rules at issue here and are not directly on point, these cases demonstrate that our Law Court has previously considered letters like those submitted by Covanta, DTE, and Argonaut to be "letters of intent to fund" and support DEP's determination in this case.

Although the solid waste license issued by DEP did not contain any findings of fact regarding Fiberight's ability to self-finance and did not expressly address the estimated $12,700,000 in annual operation and maintenance costs and closure costs, DEP's determination that Fiberight demonstrated sufficient financial ability to design, construct, operate, maintain, and close the proposed facility is supported by substantial evidence in the record. As discussed above, both DTE and Argonaut provided letters in June 2015 expressing their interest in providing financing for the proposed facility. (R. S-28.) On July 10, 2015, Applicants submitted additional information regarding DTE and its ability to provide financing for the proposed facility. (Supp. R. S-32a, S-32b, S-32c.) On December 18, 2015, Covanta provided a letter stating that it was "engaged with Fiberight to support the development, financing, construction and operation of the Project," and that Covanta was "interested in supporting Fiberight with project finance in the form of an equity investment in the Project." (R. S-82) (emphasis supplied). Applicants submitted additional financial information regarding Covanta to DEP on March 8, 2016. (R. S-93 Attach. 7.) In an email dated April 21, 2016, consultants CES confirmed to DEP that Covanta had become the primary funding source for the proposed facility. (R. S-98.) The email stated:

> ... Covanta is indeed interested in the full facility cost ($67 million) mentioned in their letter.... **Additional financing, if needed, may be obtained from other sources such as the entities that financial ability submittals (letters of interest and financial ability information) were provided in the original application.**

(*Id.*) (emphasis supplied). Furthermore, the Municipal Joinder Agreements between MRC and its joining members requires the joining municipalities to pay a "tipping fee" for the waste delivered to the facility in the amount of $70.00 per ton, subject to annual increases. (R. S-85, Municipal Joinder Agreement § 4.1.) This tipping fee shall be paid to Fiberight. (*Id.*, Master Waste Supply Agreement § 5.1.) The April 21, 2016 email from CES to DEP stated,

17

"Operational costs will be addressed through the per ton tip fees." (R. S-98) (emphasis supplied).

Based on the foregoing, there is sufficient competent evidence in the record that Fiberight has the financial ability to fund both the estimated $66,976,786 for development and construction of the facility and the estimated $12,700,000 for operation, maintenance, and closure of the proposed facility.

Lastly, DEP did not err in conditioning its approval upon submission of finalized financial documents before construction of the Fiberight facility may begin. DEP's solid waste management rules generally state, "The Department may impose any requirement as a license condition to assure compliance with State law or these rules." 06-096 C.M.R. ch. 400 § 3(F). Moreover, § 4(B)(2)(b)(i)(b) expressly provides that, when a firm commitment of money cannot be made until approvals are received and a letter of "intent to fund" is submitted to the agency, "Evidence of financing **must** be provided prior to project construction." *Id.* § 4(B)(2)(b)(i)(b) (emphasis supplied). Thus, DEP did not commit and error of law or abuse its discretion in conditioning its finding of financial ability upon Applicants submitting "finalized financial documents" prior to the beginning of construction on the Fiberight facility. Therefore, DEP's determination that Fiberight right had demonstrated sufficient financial ability was not in error.

2. *Applicants' Technical Ability*

As discussed above, applicants for a solid waste facility license must also have the "technical ability to develop the project in a manner consistent with state environmental standards and with the provisions of this chapter." 38 M.R.S. § 1310-N(2-F)(A). DEP's solid waste management rules provide, "The applicant shall have the technical ability to design, construct, operate, maintain, close and (if applicable) accomplish post-closure care of the solid

18

waste facility in a manner consistent with state environmental requirements, including the Maine Solid Waste Laws and these rules." 06-096 C.M.R. ch. 400 § 4(C)(1)(a). DEP's rules further provide that an applicant must that affirmatively demonstrates its technical through the submission of evidence such as: (a) a statement of the applicant's prior solid waste management experience, appropriate training, or both; (b) a description of the personnel who will be employed to design, construct, operate, maintain, close and accomplish post-closure care of the proposed facility; and (c) the proposed owner's and operator's prior conduct as a measure of their willingness and ability to meet all terms and conditions of approval established by DEP. *Id.* § 4(C)(2).

In issuing the solid waste license to Applicants, DEP found:

... MRC and Fiberight and their retained consultants have provided adequate evidence of technical ability to design, construct, operate, maintain and close the proposed processing facility in a manner consistent with state environmental regulations; provided that, the MRC and Fiberight submit to the Department for review and approval specific professional qualifications for personnel who will be responsible for operations at least 30 days prior to commencing pre-commissioning operations of the proposed processing facility.

(R. S-1 at 11.) Petitioners assert DEP's findings were in error because Applicants' submissions to DEP regarding their technical ability "do little more than provide general resumes of personnel whose specific roles are as yet undefined," and were therefore inadequate. (Pet'rs Br. 15.)

In their application, MRC and Fiberight submitted a statement describing both their and their retained consultants' prior solid waste management experience, including MRC's prior experience managing the PERC facility, Fiberight's experience operating a demonstration facility in Virginia, and the experience of consultants CES, Inc. ("CES") and University of Maine chemical engineering professors. (R. S-29 Attach. 8.) Applicants also submitted the

19

resumes of eleven different personnel at MRC, Fiberight, and CES detailing their experience and training. (*Id.*) Applicants submitted additional information regarding their technical ability and persons involved in the process design and operation, including evidence that operation and design of the proposed facility would be further reviewed by Amec Foster Wheeler, an engineering and product management consulting company. (R. S-79.) Applicants also submitted additional information regarding investor and operator Covanta's prior experience converting municipal waste into renewable energy, recycling metals, and other commodities. (R. S-93 Attach. 8.) It its written comments to DEP regarding the draft licenses, PERC highlighted a number of alleged issues with both Fiberight's and MRC's technical ability. (R. S-114 at 5-6.)

Based on the foregoing, DEP's determination that Applicants demonstrated sufficient technical ability to design, construct, operate, maintain, close and accomplish post-closure care of the proposed facility is supported by substantial evidence in the record, was not arbitrary or capricious, and does not constitute an abuse of discretion. Although PERC had submitted contrary information to DEP, this court will not substitute its judgment for that of DEP merely because the record might support more than one conclusion. *See Abrahamson* 584 A.2d at 670. Therefore, DEP's determination that Applicants demonstrated sufficient technical ability was not in error.

### 3. *Whether PHS is "Waste" or "Non-Waste" under Federal Regulations*

DEP issued an air emission license for two boilers at the proposed Fiberight facility to burn PHS produced at the facility for fuel. (R. A-1 at 1, 29.) In the air emission license, DEP noted that it had investigated the applicability of several federal rules to the proposed boilers. (*Id.* at 16.) The applicability of certain federal air emission regulations depends on whether PHS is considered "waste" or "non-waste" under the federal regulations. (*Id.*) If PHS is "waste," the

20

boilers are subject to additional federal regulations under 40 C.F.R. part 60, subpart AAAA. (*Id.*) If PHS is "non-waste," it is treated like a "traditional" fuel similar to biomass. (*Id.*)

Whether a fuel is "waste" or "non-waste" under federal regulation is governed by 40 C.F.R. § 241.3. According to DEP, a determination under § 241.3 is intended to be "self-certifying." (R. A-1 at 16.) No response from the EPA is required. (*Id.*) Pursuant to § 241.3(c), a solid waste facility may submit an application to the EPA Regional Administrator for a formal determination whether an intended fuel is "waste" or "non-waste." 40 C.F.R. § 241.3(c)(1). However, a formal determination remains within the discretion of the EPA Regional Administrator and is not required. *Id.* § 241.3(c) ("The Regional Administrator **may** grant a non-waste determination..." (emphasis supplied)).

In 2013, Fiberight requested a determination by the EPA whether PHS should be classified as a "non-waste." (R. A-1 at 16, A-2 Attach. C at 2-3 & App. 1.) No determination has been made by the EPA. (R. A-1 at 16.) Applicants requested that DEP process their application for an air emission license based on Fiberight's self-certification that PHS is a non-waste. (*Id.*) In the air emission license, DEP states:

> Fiberight acknowledges and understands that relying on their self-certification puts them at significant risk of not being able to operate in compliance with Federal rules should EPA make a determination that PHS does not meet the requirements to be considered non-waste.

(*Id.*) The air emission license also contained a condition requiring Applicants to submit regular compliance reports identifying how the fuel meets federal criteria for "non-waste" and whether a determination by the EPA has been received. (*Id.* at 40-41.)

Petitioners assert DEP committed an error of law and abused its discretion by accepting Fiberight's self-certification that PHS is "non-waste" and failing to making its own determination whether PHS was "waste" or "non-waste" under federal regulation. (Pet'rs Br. 15;

21

Pet'rs Reply Br. 16-17.) Petitioners also assert that DEP cannot remedy its error through conditioning the license on the EPA's eventual determination. (Pet'rs Br. 15-16.)

Neither DEP's air emission statute nor its rules require DEP to apply federal regulations, prohibit DEP from accepting an application's self-certification, or require DEP make its own determination whether the fuel to be burned by the proposed facility constitutes "waste" or "non-waste" under the federal regulations. 38 M.R.S. § 590(2) (criteria for granting air emission license); 06-096 C.M.R. ch. 115 § 4(C)(6) (criteria for license approval of a new minor source). Because DEP is not required to apply federal regulations or make such determinations before issuing an air emission license, DEP's acceptance of Fiberight's self-certification that PHS is "non-waste" was not an error of law or an abuse of discretion.

Moreover, pursuant to both its statute and rules, DEP may impose any reasonable and appropriate conditions on the air emission license in order to ensure or maintain compliance. 38 M.R.S. § 590(2); 06-096 C.M.R. ch. 115 §§ 3(E), 4(C)(5). Therefore, DEP's decision to condition the air emission license upon the EPA's eventual determination was also not an error of law or abuse of discretion.[6]

---

[6] In their reply brief, Petitioners assert for the first time that DEP erred by failing to determine whether DEP's beneficial use rules, 06-096 C.M.R. ch. 418, applied to PHS as "solid waste." (Pet'rs Reply Br. 15.) Under the Maine Rules of Civil Procedure, a reply "shall be strictly confined to replying to new matter raised in the opposing memorandum," M.R. Civ. P. 7(e); M.R. Civ. P. 80C(a) ("A review of final agency action … shall be governed by these Rules of Civil Procedure as modified by this rule,…"). Because Petitioners raise their argument regarding DEP's beneficial use rules for the first time in their reply, those arguments are not properly before the court and may be disregarded. Moreover, because DEP accepted Fiberight's self-certification that PHS was "non-waste," DEP's beneficial use rules do not to PHS. (R. A-1 at 16); 06-096 C.M.R. ch. 418 § 1(A) (Feb. 8, 2012) (stating that chapter 418 applies to solid waste).

22

### 4. Maine's Solid Waste Management Hierarchy

Maine's solid waste management hierarchy provides:

It is the policy of the State to plan for and implement an integrated approach to solid waste management for solid waste generated in this State and solid waste imported into this State, which must be based on the following order of priority:

A. Reduction of waste generated at the source, including both amount and toxicity of the waste;

B. Reuse of waste;

C. Recycling of waste;

D. Composting of biodegradable waste;

E. Waste processing that reduces the volume of waste needing land disposal, including incineration; and

F. Land disposal of waste.

It is the policy of the State to use the order of priority in this subsection as a guiding principle in making decisions related to solid waste management.

38 M.R.S. § 2101(1). DEP's solid waste management statute provides, "The department shall issue a license for a waste facility whenever it finds that: ... The practices of the facility are consistent with the State's solid waste management hierarchy set forth in section 2101." 38 M.R.S. § 1310-N(1)(D). DEP's solid waste rules also require that, in order to obtain a license, the proposed facility "must be consistent with the State's solid waste management hierarchy set forth in 38 M.R.S.A. §2101." 06-096 C.M.R. ch. 400 § 4(N)(1). An applicant must submit descriptions of its reduction, recycling, and reuses processes and other evidence which affirmatively demonstrates that the proposed facility's purpose and practices are consistent with the state's solid waste management hierarchy and that the facility will implement waste reduction and recycling approaches into its operations to the maximum extent possible. *Id.* § 4(N)(2).

Petitioners assert that DEP "took a narrow approach to this requirement in its licensing findings, presuming that the Fiberight facility was feasible and viewing its practices in a vacuum." (Pet'rs Br. 16.) Petitioners assert that DEP did not take a statewide view of the solid

23

waste management hierarchy and did not consider the impact of the Fiberight facility on existing facilities, such as the PERC facility. (*Id.* at 16-17.) Petitioners argue, "if Fiberight fails and PERC is compromised or changes its model, the waste from the relevant communities will go from 90% reduction in mass at PERC to being 100% landfilled..." (*Id.*) Petitioners assert that this outcome would be contrary to the policy goals of waste management hierarchy. (*Id.*)

In the license, DEP made the following findings of fact regarding the solid waste management hierarchy: that Applicants demonstrated their support for further waste reduction, reuse, and recycling by permitting their customer municipalities to expand existing or future programs intending to encourage the reduction, reuse, and recycling of solid waste; that Applicants are committed to sponsoring community programs to encourage waste reuse at the local level; that the proposed facility will remove recyclables from the waste stream and convert organics into renewable products; that the proposed system is expected to divert additional materials from the waste system and will overall reduce the volume of solid waste requiring land disposal; that Fiberight's system strengthens conformity with the solid waste management hierarchy by capturing, processing, and marketing additional quantities of recycles at the regional level; that organic materials not composted at the local level will be converted into renewable fuel products and/or biogas at the facility, which is an increase in conformity with the hierarchy over existing systems; that 70% to 80% of all incoming municipal solid waste will be recycled and processed at the proposed facility; that Applicants have entered into a agreement with a landfill for the remaining 20% to 30% of incoming waste that will require landfilling; and that Applicants have adequately addressed solid waste management in a manner consistent with the State's solid waste management hierarchy. (R. S-1 at 27-29.) DEP also attached several

24

conditions to its findings regarding the solid waste management hierarchy in order to ensure further compliance. (*Id.* at 29.)

As part of their application, MRC and Fiberight submitted Process Design Information, which included among other documents, a report on residues to be landfilled and a 2015 technology review by the University of Maine which concluded that "Fiberight's processing technology is sound and capable of converting the insoluble portion of MSW organics to a simple sugar solution." (R. S-29 Attach. 13.) Applicants also submitted a description of how Fiberight's process is consistent with the state's solid waste management hierarchy. (*Id.* Attach. 25.) Applicants then submitted Revised Process Design Information which discussed Fiberight's process for converting waste received into recyclables to be sold as commodities, PHS to be used as fuel in on-site biomass boilers, bio-methane that will be piped to an adjacent pipeline, biomass fuels to be sold as commodities, and resultant residue waste to be landfilled. (R. S-93 Attach. 13.) Applicants also submitted a "mass balance summary" which estimated that between 475 and 525 tons of waste per day would be diverted from landfills and that 70% to 80% of the waste received at the facility would be recycled or processed into fuel. (R. S-93 at 11 & Attach. 25.) DEP also received letters of support for the Fiberight facility from the Maine Resource Recovery Association, which asserted that the proposed Fiberight facility was consistent with the solid waste management hierarchy. (R. S-83.) Applicants also submitted additional documents addressing the state's solid waste management hierarchy, local management of waste reduction and recycling efforts, and MRC's waste disposal agreements with a landfill. *See* (R. S-84, S-95.)

DEP also received written comments from USAE, PERC, and the Maine Legislature's Joint Standing Committee on Environment and Natural Resources asserting that the proposed Fiberight facility is inconsistent with the state's solid waste management hierarchy for the

25

following reasons: (1) the facility will not be ready to receive waste until 2020, requiring municipalities to directly landfill 100% of their waste until then; (2) Fiberight's demonstration facility in Virginia has not actually reduced the volume of solid waste; (3) Fiberight's assertion that it will reduce the volume of waste by 70% to 80% is less than what has been achieved by PERC, which currently reduces the volume of waste by approximately 90%; (4) Fiberight's process requires that organic waste continue to be mixed with solid waste, rather than separated at the local level; and (5) the proposed process is untested and any delays or miscalculations could lead to additional landfilling of municipal waste. (R. S-114 at 2, S-120 at 4-5, S-122 at 1.) MRC acknowledged that there is a risk that the Fiberight facility could fail and that it had secured back-up capacity at a landfill in order to divert solid waste if the Fiberight is delayed or unsuccessful. (R. S-65.)

Based on the foregoing, DEP's determination that the proposed facility was consistent solid waste management hierarchy is supported by substantial evidence in the record. Although DEP did receive credible contrary evidence suggesting that the proposed facility was not consistent the solid waste management hierarchy, the court will not substitute its own judgment for that of the agency merely because the record could support more than one conclusion. *See* *Abrahamson* 584 A.2d at 670. Therefore, DEP finding that the process and purpose of the proposed Fiberight facility are consistent with the State's solid waste management hierarchy was not in error.

### 5.  *DEP's Denial of a Public Hearing*

Lastly, Petitioners assert that DEP erred in declining to hold a public hearing at the outset of the administrative process and denying later requests for a public hearing as untimely. (Pet'rs Br. 18.) DEP's governing statute provides, "The board and commissioner **may** hold public

26

hearings as necessary to carry out responsibilities under this Title." 38 M.R.S. § 345-A(1-A) (emphasis supplied). "Except as provided elsewhere, all hearings of the department must be conducted in accordance with the procedural requirements of the Maine Administrative Procedure Act, Title 5, chapter 375." *Id.* § 345-A(2). DEP's rules provide in relevant part:

> A. Request for a Hearing on a License Application. The Department shall provide an opportunity for the applicant or any person to request a hearing with respect to any application. A hearing is an opportunity for an applicant, an appellant, any intervenors, and members of the public to provide testimony under oath and for witnesses to be cross-examined on the substance of their testimony. **A request for a hearing on an application must be received by the Department, in writing, no later than 20 days after the application is accepted as complete for processing.**
>
> B. Criteria for Holding Hearings. **Hearings are discretionary** unless otherwise provided by law. ... The Department will hold a hearing in those instances where the Department determines there is **credible conflicting technical information** regarding a licensing criterion and it is likely that a hearing will assist the Department in understanding the evidence. ...
>
> C. Conduct of Hearings. Hearings are held in accordance with the *Maine Administrative Procedure Act*, Title 5, chapter 375, subchapter 4, and the Department's rules governing licensing hearings. ...

06-096 C.M.R. ch. 2 § 7 (Oct. 19, 2015) (emphasis supplied).

Chapter 3 of DEP's rules sets forth the procedures for DEP licensing hearings. 06-096 C.M.R. ch. 3 § 1 (Feb. 16, 2015). Under Chapter 3, a "hearing" is defined as "a hearing conducted in accordance with the procedural requirements of the Maine Administrative Procedure Act, Title 5, chapter 375, subchapter IV at which the Department receives oral testimony and evidence for the purpose of gathering facts upon which a decision in a licensing proceeding will be based." *Id.* § 2(H). Subchapter 4 of the APA governs the procedures for adjudicatory proceedings before an agency. *See* 5 M.R.S. §§ 9051-9064.

Thus, a public hearing before DEP on a license application is not merely a forum for public comment on the application. A public hearing is an adjudicatory processing in which

27

witnesses provide testimony under oath and are subject to cross-examination. DEP's statute and rules unambiguously state that an application for a public hearing must received "no later than 20 days after the application is accepted as complete for processing," that DEP will hold a hearing only if (1) there is credible conflicting technical information regarding a licensing criterion, and (2) it is likely that a hearing will assist DEP in understanding the evidence, and that the decision to hold a hearing is entirely within DEP's discretion. *See Martha A. Powers Trust v. Bd. of Envtl. Prot.*, 2011 ME 40, ¶¶ 9-10, 15 A.3d 1273; *Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶¶ 18-23, 15 A.3d 1263 (stating that the decision to hold a public hearing pursuant to under 38 M.R.S. § 345-A(1-A) and 06-096 C.M.R. ch. 2 § 7 is discretionary).

DEP accepted MRC and Fiberight's joint applications for processing on July 15, 2015. (R. S-37a.) Thus, any requests for a hearing were due on or before August 4, 2015. 06-096 C.M.R. ch. 2 § 7(A). None of the Petitioners timely filed a request for a public hearing. (R. S-1 at 2, S-45, S-46, S-47, S-48, S-49.) DEP received five requests for a public hearing from members of the public concerning the following: (1) MRC's authority, its use of tip fee stabilization funds, a lack of showing the MRC members will enter into contract with the facility, and a lack of showing that Fiberight has markets for its products; (2) vernal pools, wetlands, a stream, traffic, property values, and air emission; (3) the state's solid waste management hierarchy; (4) air emission and efforts to make the public aware of the proposed facility; and (5) "conflicting possible outcomes technically and scientifically," the uncertainties of regional waste allegiances, and the lack of public access to facts regarding the proposal. (R. S-45, S-46, S-47, S-48, S-49.) DEP determined that there was insufficient "credible conflicting technical information regarding licensing criteria to support a public hearing." (*Id.*; R. S-1 at 2.)

28

DEP did hold a public meeting on November 19, 2015, in accordance with 06-096 C.M.R. ch. 2 § 8 and 38 M.R.S. § 345-A(5), in order to provide the public with an overview of the proposed facility and an opportunity for comment. (R. S-1 at 2-3, S-62, S-72.) DEP also received detailed written comments critical of MRC and Fiberight's applications for solid waste and air emission licenses, including comments from a biological and chemical engineer and professor, a chemical and environmental engineer, and the Natural Resources Counsel of Maine. (R. S-57, S-74, S-86, S-87, S-100, A-40, A-41, A-52, Supp. R. S-138.) None of the Petitioners submitted written comments prior to DEP's issuance of the draft licenses. During the review process, Applicants submitted numerous supplemental documents, much of it in response to DEP's questions and requests for additional for information. (R. S-54, S-61, S-63, S-64, S-68, S-70, S-71, S-75, S-77, S-78, S-79, S-80, S-81, S-90, S-93, S-95, S-96, S-97, S-102, S-106, S-107.)

DEP released drafts of the solid waste and air emission licenses on June 13, 2016. (R. S-1 at 3, S-108, A-54.) DEP received written comments critical of the draft licenses from several members of the public, including PERC and USAE. (R. S-1 at 3, S-113, S-114, S-115, S-116, S-117, S-118, S-119, S-120, S-122.) In their written comments regarding the draft licenses, PERC and USAE requested that DEP holding a public hearing on the MRC and Fiberight's applications. (R. S-114 at 13-14, S-120 at 5-6.) PERC and USAE asserted that the supplemental information submitted to DEP, much of it submitted the after the twenty-day request period, contained conflicting technical information regarding licensing criteria, necessitating a public hearing. (R. S-114 at 14, S-120 at 5-6.)

DEP issued final licenses to MRC and Fiberight on July 14, 2016. (R. S-1, A-1, L-1.) In the final solid waste license, DEP stated that it was unable to act on the later requests for public hearing because they were received after the twenty-day request period. (R. S-1 at 5.) DEP also

29

noted, "while a series of supplemental submittals were provided after the Application was submitted and accepted for processing, a public hearing will not further the Department's understanding or technical knowledge of the proposed processing facility project." (*Id.*)

Given the amount of supplemental technical information provided by Applicants in response to DEP's questions and requests and the amount and detail of the written comments submitted to DEP by members of the public, including PERC and USAE, the court cannot say that DEP "exceeded the bounds of the reasonable choices available to it" in determining that there was not sufficient credible conflicting technical information regarding licensing criteria to warrant an adjudicatory public hearing. *See Friends of Me.'s Mts.*, 2013 ME 25, ¶ 11, 61 A.3d 689. Thus, DEP did not abuse its discretion in declining to hold a public hearing.

## IV. CONCLUSION

Based the foregoing, Petitioners Penobscot Energy Recovery Company, LP, USA Energy Group, LLC, and Exeter Agri-Energy, LLC's appeal of final agency action by the Maine Department of Environmental Protection is **DENIED**. The decision of the Maine Department of Environmental Protection is **AFFIRMED**.

Pursuant to Maine Rule Civil Procedure 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated    March 15, 2017

M. Michaela Murphy
Justice, Business and Consumer Court

Entered on the Docket: 3/15/17
Copies sent via Mail___ Electronically ✓

Penobscot Energy Recovery Co, LP,
USA Energy Group, LLC
and Exeter Agri-Energy, LLC v.
Maine Department of Transportation,
Fiberight, LLC (PII) and
Municipal Review Committee (PII)

BCD-AP-16-15

### Plaintiff

Penobscot Energy Recovery Co, LP

Jon Doyle, Esq.
150 Capitol St
Augusta, ME 04330

### Defendant

**Maine Department of Transportation**

Mary Sauer, AAG.
6 State House Station
Augusta, ME 04333

### PII

**Fiberight, LLC**

Roger Huber, Esq.
PO Box 738
Bangor, ME 04402

**Municipal Review Committee**

Jonathan Pottle, Esq.
PO Box 1210
Bangor, ME 04402

STATE OF MAINE
CUMBERLAND, SS.

BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND
DOCKET NO. BCD-AP-16-15

PENOBSCOT ENERGY RECOVERY
COMPANY, LP,
USA ENERGY GROUP, LLC, and
EXETER AGRI-ENERGY, LLC,

      Petitioners,

    v.

MAINE DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
MUNICIPAL REVIEW
COMMITTEE, INC., and
FIBERIGHT, LLC,

      Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON PETITONERS' MOTION
TO TAKE ADDITIONAL EVIDENCE**

Petitioners Penobscot Energy Recovery Company, LP, USA Energy Group, LLC, and Exeter Agri-Energy, LLC (collectively "Petitioners") filed a motion to have that this appeal of final agency action be remanded to the Maine Department of Environmental Protection ("DEP") for the taking of additional evidence before the agency. Based on the following, Petitioners' motion is denied.

I.    **BACKGROUND**

Respondents Fiberight, LLC ("Fiberight") and Municipal Review Committee, Inc. ("MRC") filed an application with DEP in June 2015 for an Air Emission License for a proposed municipal solid waste processing facility located in Hampden, Maine. (R. A-2 at 1.) The application concerned two boilers at the facility. (R. A-1 at 1.) The primary fuel for the boilers are post-hydrolysis solids produced by Fiberight ("PHS"). (*Id.*) Fiberight has self-certified, pursuant to federal regulation 40 CFR Part 241.3, that PHS are a non-hazardous secondary

1

material and not considered "waste" under federal regulation. (R. A-1 at 16.) Because Fiberight chose to "self-certify" pursuant to 40 CFR Part 241.3, no determination from the federal Environmental Protection Agency ("EPA") was required. (*Id.*) However, in 2013, Fiberight submitted its self-certification to EPA and asked for determination whether PHS were "non-waste" under federal regulations. (*Id.*) At the time Fiberight and MRC applied for their license from DEP, no determination had been made by the EPA. (*Id.*) Fiberight and MRC requested that DEP process their application for an Air Emissions License based on their self-certification that PHS were "non-waste." (*Id.*) DEP issued an Air Emissions License to Fiberight and MRC on July 14, 2016. (*Id.* at 46.)

Petitioners filed their petition for review of a final agency action pursuant to § 11002 of the Maine Administrative Procedures Act (the "APA") and Maine Rule of Civil Procedure 80C on August 12, 2016. This appeal was transferred to the Business and Consumer Docket on October 14, 2016. DEP filed the administrative record with the court on October 19, 2016.[1] Petitioners filed their motion for taking of additional evidence on October 31, 2016. Petitioners request that this appeal be remanded to DEP for the taking of additional evidence regarding the EPA's determination of whether PHS constitute "waste" or "non-waste" under federal regulation. (Pets. Mot. Add'l Evid. 2.) Respondents DEP, Fiberight, and MRC each filed an opposition to the motion on November 21, 2016. Petitioners filed their reply November 28, 2016, and oral argument on the motion was conducted telephonically on January 4, 2017.

## II.    STANDARD OF REVIEW

Pursuant to Maine Rule of Civil Procedure Rule 80C(e) and § 11006(1) of the APA, a party seeking judicial review of a final agency action may file a motion requesting that the court

---

[1] DEP also filed a supplemental record on December 1, 2016.

2

order the taking of additional evidence before the agency. M.R. Civ. P. 80C(e); 5 M.R.S. § 11006(1)(B). The motion shall be supported by a "detailed statement, in the nature of an offer of proof, of the evidence intended to be taken." M.R. Civ. P. 80C(e). The moving party's detailed statement must be sufficient to permit the court to determine whether the taking of additional evidence is appropriate. *Id.*

Section 11006(1)(B) of the APA provides that the court may order the taking of additional evidence by the agency if: (1) the court finds that that the additional evidence is necessary to deciding the petition for review; or (2) if the moving party demonstrates (a) that the additional evidence is material to the issues presented in the review; and (b) the additional evidence could not have been presented or was erroneously disallowed in the proceedings before the agency. 5 M.R.S. § 11006(1)(B). After the taking of additional evidence, the agency may modify its findings and decisions. *Id.* The agency shall file the additional evidence and any new findings or decisions with the court, which shall become part of the record for review. *Id.*

## III. ANALYSIS

Foremost, Petitioners have failed to file a detailed offer of proof regarding the additional evidence intended to be taken as required by Rule 80C(e). Thus, the court lacks the requisite offer of proof to make a determination regarding the taking of additional evidence. Because Petitioners have failed to satisfy the procedural requirements of Rule 80C(e), Petitioners are not entitled to a remand for the taking of additional evidence pursuant to § 11006(1)(B) of the APA and Rule 80C(e).

Even if Petitioners had provided the requisite offer of proof, Petitioners would still not be entitled to a remand for the taking of additional evidence because Petitioners concede that the additional evidence to be taken does not yet exist. In their initial motion, Petitioners assert that

3

there is "likely" additional information concerning the status of the EPA's determination regarding the PHS, not available before, that is material to their appeal. (Pets. Mot. Add'l Evid. 2-6.) However, in their reply brief, Petitioners concede that as of November 18, 2016, no determination had been made by the EPA. (Pets. Reply to Resp't Opp'n 3-4.) During oral argument on January 4, 2017, it was further stated that there has still been no determination by the EPA and that there is no timeline for a determination. Nevertheless, Petitioners assert that this appeal should be remanded to DEP for the taking of additional evidence as soon as the EPA makes a determination. (*Id.*)

Section 11006(1)(B) does not permit the court to issue an open-ended remand to an agency for the taking of hypothetical evidence if and when such evidence becomes available. The court may order the taking of additional evidence only if court finds that the additional evidence is necessary to deciding the petition for review or the moving party demonstrates that the evidence is material and could not have been presented previously or was erroneously disallowed. 5 M.R.S. § 11006(1)(B). When acting in an appellate capacity pursuant to Rule 80C and the APA, the court reviews the agency's decision for abuse of discretion, error of law, or findings not supported by the evidence. *Guar. Tr. Life Ins. Co. v. Superintendent of Ins.*, 2013 ME 102, ¶ 16, 82 A.3d 121; 5 M.R.S. § 11007(4)(C).

Because the additional evidence did not exist at the time DEP issued the Air Emission License, and still does not exist, the additional evidence is neither necessary nor material to the court's determination of whether DEP committed an abuse of discretion or error of law in reaching its decision or whether its findings are not supported by the evidence when the decision was made. *See FPL Energy Maine Hydro, LLC v. State*, 2009 Me. Super. LEXIS 53, at *10-11 (Feb. 9, 2009) ("using evidence that did not exist at the time the [agency] made its decision to

4

fairly review the [agency's] decision runs completely counter to the purpose of Rule 80C review. … Such post-decisional evidence would, accordingly, appear to be immaterial to the issues presented on review…"). Furthermore, because the additional evidence did not exist at the time DEP issued the Air Emission License, it could not have been erroneously disallowed during the proceeding before the agency. Therefore, even if Petitioners had provided the requisite offer of proof, Petitioners would not be entitled to a remand for the taking of additional evidence.

## IV. CONCLUSION

Based the foregoing, Petitioners Penobscot Energy Recovery Company, LP, USA Energy Group, LLC, and Exeter Agri-Energy, LLC's motion for the taking of additional evidence by the agency is **DENIED**.

Pursuant to Maine Rule Civil Procedure 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated 1/6/17

s//_____

**M. Michaela Murphy**
**Justice, Business and Consumer Court**

5